**Frankie (Wilson) STEVENSON et al.**

v.

**INTERNATIONAL PAPER COMPANY et al.**

Civ. A. No. 18877.

United States District Court,
W. D. Louisiana,
Monroe Division.

April 29, 1977.

As Amended May 11, and 13, 1977.

---

Stephen J. Katz, Kidd, Katz & Strickler, Monroe, La., for plaintiffs.

James E. Youngdahl and Pamela D. Walker, Youngdahl, Larrison & Agee, Little Rock, Ark., for defendant Unions.

STAGG, District Judge.

## OPINION

On April 2, 1973, Frankie Wilson Stevenson, Ruthie Adams, Doris Roberts, Paula Thompson and Lois Hemphill, on behalf of themselves and all others similarly situated, commenced this action against International Paper Company (Company) and the International Brotherhood of Pulp, Sulphite and Paper Mill Workers Burke Local 582 (Burke Local 582). They sought redress for alleged violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*

The suit has been constantly in motion from its inception. On October 30, 1973, the United Paperworkers International Un-

ion Local No. 582 (Local 582), answered the complaint as successor to Burke Local 582. The Company moved to dismiss the complaint against it for failure to join an indispensable party, the United Paperworkers International Union (International Union), on April 8, 1974. Reacting to the Company's motion, the plaintiffs supplemented and amended their original complaint, stating Title VII claims against the International. The plaintiffs having moved the Court to certify the class they sought to represent, the Court granted the motion on September 5, 1974; the class included all females who had been or were employed at the Bastrop Plant of the Single Service Division of International Paper Company.

In its answer to the original complaint, Local 582 cross-claimed against the Company, urging that the Company had discriminated against its female members. The Company moved to dismiss the cross-claim for failure to state a claim on which relief could be granted. Stating, "[T]he continuation of the cross-claim is to be based on principles of applicable tort law rather than on an E.E.O.C. claim," the Court, on March 13, 1975, denied the motion.

On June 6, 1975, the Company answered the complaint and cross-claim; it also filed a cross-claim against the International Union and Local 582, asserting rights of contribution and indemnification. In answer to the cross-claim, on June 20, 1975, Local 582 and the International Union filed a counter cross-claim against the Company, also asserting rights of contribution and indemnification.

After filing a consent decree between it and plaintiffs, the Company re-urged its motion to dismiss Local 582's original cross-claim on May 7, 1976. It stated that the consent decree would settle all issues of discrimination between the Company and its female employees. After approving the consent decree, the Court dismissed all cross-claims between the Company and the Unions on July 29, 1976.

The Company and the plaintiffs jointly moved the Court to approve a consent decree settling all class claims against the Company on May 7, 1976. The Company agreed to pay $4,200 to plaintiffs' attorneys for their fees and to pay $30,000 to the class, to be deposited with the plaintiffs' attorneys and to be distributed as determined by the plaintiffs' attorneys or the Court. The parties notified all members of the class, who could object to the proposed settlement within thirty (30) days of the notice. Several class members objected, and on June 25, 1976, the Company and the plaintiffs jointly moved to amend the decree. Pursuant to the amendment, the Company would deposit $30,000 in the Registry of the Court. The Court then would order the appropriate distribution of the fund after the trial of issues between the Unions and the plaintiffs. After 30 days the Court disallowed the objections of several parties, gave its final approval to the consent decree, and dismissed plaintiffs' Title VII claims against the Company.

By approving the consent decree the Court also approved a supplemental agreement between the Company, the International Union and Local 582. The supplemental agreement, now in effect, revised the lines of progression at the Bastrop Plant, discarded departmental seniority in favor of plant seniority, provided for the posting of bid notices, and greatly altered a number of other terms and conditions of employment about which the plaintiffs had complained. The full text of the supplemental agreement appears as the Appendix of this opinion.

The procedural context of the trial engendered several motions by the Unions. They first moved to sever the claims of the class against the Unions from the claims of contribution and indemnification between the Unions and the Company. Just prior to trial they moved to bifurcate the first part of the trial, trying liability separately from quantum. Finally, the International Union moved to dismiss the claims against it for lack of subject matter jurisdiction, the plaintiffs having failed to name it as a respondent in any charge filed with the

Equal Employment Opportunity Commission (E.E.O.C.)[1]

In partial response to the motion to dismiss, plaintiffs amended their complaint to allege that the International and Local 582 had violated 42 U.S.C. § 1985 by conspiring to deprive plaintiffs of the equal protection of the laws. The Court took the motion to dismiss under advisement and granted the second bifurcation motion.

The trial was to proceed through two possible phases: determination of Union liability and computation of the amount of back pay due by the Unions to each individual class member. The Court heard evidence on the first phase at trial on July 29–30, 1976. It took the issues of Union liability under advisement at the close of the evidence, pending receipt of all briefs.

## JURISDICTION OVER CLAIMS AGAINST THE INTERNATIONAL UNION

Just prior to trial the International Union moved to dismiss the claims against it for failure of the plaintiffs to name it as a respondent in the charges filed with the E.E.O.C.; it argued that the Court did not have subject matter jurisdiction over the Title VII claims against it. Subsequently, plaintiffs sought and obtained leave to amend their complaint to allege that the International Union and Local 582 had violated 42 U.S.C. § 1985. The essence of plaintiffs' claims pursuant to section 1985 is that the Unions conspired with each other or the Company to deprive plaintiffs of the equal protection of the laws by discriminating against them in their terms and conditions of employment on the basis of their sex. Their claims must come within the

provisions of 42 U.S.C. § 1985(3), which proscribes conduct by which:

"[T]wo or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities under the laws. . . ."

The United States Supreme Court addressed the power of § 1985(3) to reach purely private conduct in *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). In *Griffin,* the black plaintiffs alleged that the defendants, private white citizens, had violated § 1985(3) by preventing plaintiffs' passage on the highway and by beating them. Both lower courts had decided that the complaint fatally neglected to allege any state action on the part of the defendants. The Supreme Court held that an allegation of state action was not necessary in every claim under § 1985(3), that the provision could reach purely private conspiracies. It reversed the lower courts, stating that racial discrimination by private persons was within the reach of the section. But the Court was careful to remonstrate that the section did not reach every private conspiracy.[2] Specifically, the Court did not rule on any private conduct beyond conspiracies to discriminate on the basis of race.[3]

Circuit court decisions since *Griffin* have conflicted on the scope and breadth of § 1985(3). Some courts have held that the section reaches purely private conspiracies that deny persons the equal protection of the laws because they exercised their rights pursuant to the First Amendment to the United States Constitution.[4] Other courts

1. *See* 42 U.S.C. § 2000e–5(f)(1).

2. "That the statute was meant to reach private action does not, however, mean that it was intended to apply to all tortious conspiratorial interferences with the rights of others." 403 U.S. at 101, 91 S.Ct. at 1798.

3. "We need not decide, given the facts of this case, whether a conspiracy motivated by invidiously discriminatory intent other than racial bias would be actionable under the portion of

§ 1985(3) before us." 403 U.S. at 102 n.9, 91 S.Ct. at 1798 n.9.

4. *Cameron v. Brock,* 473 F.2d 608 (6th Cir. 1971); *Action v. Gannon,* 450 F.2d 1227 (8th Cir. 1971); *Richardson v. Miller,* 446 F.2d 1247 (3d Cir. 1971). The United States Court of Appeals for the Fifth Circuit specifically has avoided the identical issue. *McLellan v. Mississippi Power & Light Co.,* 545 F.2d 919, 925, n. 22 (5th Cir. 1977) (En Banc) *reversing on rehearing* 526 F.2d 870 (5th Cir. 1976).

have limited the section, as it relates to purely private conduct, to racial motivation.[5] The United States Court of Appeals for the Second Circuit has avoided the issue of whether § 1985(3) reaches private conspiracies to discriminate on the basis of sex,[6] and the Seventh Circuit has decided that the section does not reach such private conspiracies.[7] The circuit court opinions do not answer the question whether private sex discrimination is actionable under § 1985(3). In the face of conflicting and confusing precedents, the Court would be unwise to rest its decision on § 1985 if another remedy exists.

Section 706 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–5, establishes the procedure for pursuing claims of employment discrimination. The claimant files a charge with the E.E.O.C., which investigates the charge and attempts to mediate the claims of the respective parties. If the conciliation fails, the E.E.O.C. issues a letter informing the claimant that he or she has the right to sue to obtain relief in federal district court. The complainant then must choose whether to pursue his or her claim further.

 The procedure has the two-fold purpose of notice to the charged party and of bringing the charged party before the E.E.O.C. in an attempt to secure voluntary compliance with Title VII. *Evans v. Sheraton Park Hotel*, 164 U.S.App.D.C. 86, 503 F.2d 177 (1974); *Bowe v. Colgate-Palmolive Co.*, 416 F.2d 711 (7th Cir. 1969). Clearly the predominant purpose is the attempt at voluntary compliance. *See Le Beau v. Libbey-Owens-Ford Co.*, 484 F.2d 798 (7th Cir.

1973); *Johnson v. Seaboard Air Line R. R. Co.*, 405 F.2d 645 (4th Cir. 1968); *Diaz v. Pan American World Airways, Inc.*, 346 F.Supp. 1301, 1306 (S.D.Fla.) *amended*, 348 F.Supp. 1083 (S.D.Fla.1972); *Jamison v. Olga Coal Co.*, 335 F.Supp. 454 (S.D.W.Va. 1971); *Fix v. Swinerton and Walberg Co.*, 320 F.Supp. 58, 59 (D.Colo.1970). As a result of the policy favoring voluntary compliance with equal employment provisions, generally a complainant may not advance a claim pursuant to Title VII against a party who was not a named respondent in the E.E.O.C. charge giving rise to the suit. 42 U.S.C. § 2000e–5(e). *E. g., Mickel v. State Employment Service*, 377 F.2d 239 (4th Cir. 1967); *Cox v. United States Gypsum Co.*, 284 F.Supp. 74 (N.D.Ind.1968). Some courts have articulated the rule as a jurisdictional requirement for Title VII claims in federal district court. *E.g., Le Beau v. Libbey-Owens-Ford Co., supra; Jamison v. Olga Coal Co., supra; Sokolowski v. Swift and Co.*, 286 F.Supp. 775 (D.Minn.1968).

The rigidity of the jurisdictional interpretation has created practical problems in enforcing the right to equal employment opportunities. Workers often file charges with the E.E.O.C. without the assistance of counsel. Clearly, the uncounseled complainant cannot possess the technical prowess required to avoid procedural pitfalls. Thus, some courts hold that, under certain circumstances, a federal district court has jurisdiction over a Title VII claim against a party who was not charged before the E.E.O.C. The holdings are especially noticeable in cases involving parties engaged in close legal relationships, such as successor corpo-

---

**5.** *Bellamy v. Mason's Stores, Inc.*, 508 F.2d 504 (4th Cir. 1975); *Cohen v. Illinois Institute of Technology*, 524 F.2d 818 (7th Cir. 1975).

**6.** *Weise v. Syracuse University*, 522 F.2d 397 (2d Cir. 1975).

**7.** *Cohen v. Illinois Institute of Technology*, 524 F.2d 818 (7th Cir. 1975). One panel of judges of the Fifth Circuit had intimated that the section could reach nearly all private conspiracies that resulted in class-based discrimination. *Westberry v. Gilman Paper Company*, 507 F.2d 206 (5th Cir. 1975). However, the opinion became moot pending rehearing and the Court

withdrew it, remanding the case to the district court "so that it will spawn no legal precedents." 507 F.2d at 216. The latest expression from the Fifth Circuit, *McLellan v. Mississippi Power & Light Company*, 545 F.2d 919 (5th Cir. 1977), states that private conspirators must do something contrary to a law other than § 1985(3) for a class-wide discriminatory reason in order to be liable under the section. While holding that voluntary bankrupts are not a class protected by the statute, the Court does not define the scope of classes protected or activities proscribed by the statute.

rations,[8] university systems and branches,[9] and union hierarchies.[10]

The cases are divided over whether, and when, a regional or international union may be sued on a Title VII claim in federal district court without being named as a charged party or respondent in administrative proceedings before the E.E.O.C. Some courts steadfastly have maintained that they lack jurisdiction over Title VII claims against unions not charged in the E.E.O.C. stage. *Le Beau v. Libbey-Owens-Ford Co.*, 484 F.2d 798 (7th Cir. 1973); *Bowe v. Colgate-Palmolive*, 416 F.2d 711 (7th Cir. 1969); *Arnold v. Consolidated Freight Ways, Inc.*, 399 F.Supp. 76 (S.D.Tex.1975); *Holiday v. Red Ball Motor Freight, Inc.*, 399 F.Supp. 81 (S.D.Tex.1974); *Jamison v. Olga Coal Co.*, 335 F.Supp. 454 (S.D.W.Va.1971); *Butler v. Local No. 4*, 308 F.Supp. 528 (N.D.Ill. 1969). Others have allowed the claims against the unions for a variety of reasons. Unions have lost their bids to be dismissed when joined for interpretive [11] or relief [12] purposes only, on an agency theory,[13] and as indispensable parties joined to prevent dismissal pursuant to Rule 19 of the Federal Rules of Civil Procedure.[14] In *EEOC v. Detroit Edison Company*, 515 F.2d 301 (6th Cir. 1975), the Court allowed a Title VII claim against an international union that had not been a named respondent in an E.E.O.C. charge with no discussion of its underlying rationale.

The leading circuit court case concerning international unions not named respondents before the E.E.O.C. is *Evans v. Sheraton Park Hotel*, 164 U.S.App.D.C. 86, 503 F.2d 177 (1974). *Evans* involved a suit by a member of Waitresses Local 507 against her employer, her local union and the joint executive board of her international union, complaining about the segregated locals for waiters and waitresses. The defendants moved to dismiss for failure to join indispensable parties, the international union and the waiters local. The district court allowed her to amend her complaint, adding the missing parties. The international union and the waiters local moved to dismiss for lack of subject matter jurisdiction, the plaintiff having failed to name them in her charge with the E.E.O.C. The district court denied the motions and the international union appealed.

In affirming the district court, the United States Court of Appeals for the District of Columbia Circuit examined the purpose of the E.E.O.C. charge procedures. Citing *Bowe v. Colgate-Palmolive Company*, 416 F.2d 711 (7th Cir. 1969), the Court determined that Section 706, 42 U.S.C. § 2000e–5, aimed toward voluntary compliance with Title VII. It said, however, that the initial filing stage should not preclude complainants from obtaining relief due to intricate procedural pitfalls.[15] The Court continued

**8.** *Escamilla v. Mosher Steel Co.*, 386 F.Supp. 101 (S.D.Tex.1975).

**9.** *Solin v. State University of New York*, 416 F.Supp. 536 (S.D. N.Y.1976).

**10.** *E. g., EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086 (6th Cir. 1974); *Evans v. Sheraton Park Hotel*, 164 U.S.App.D.C. 86, 503 F.2d 177 (1974); *EEOC v. Painters Local 857*, 384 F.Supp. 1264 (D.S.D.1974); *Taylor v. Armco Steel Corp.*, 373 F.Supp. 885 (S.D.Tex. 1973).

**11.** *EEOC v. McLean Trucking Co.*, 525 F.2d 1007 (6th Cir. 1975).

**12.** *EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086 (6th Cir. 1974).

**13.** *Sokolowski v. Swift and Co.*, 286 F.Supp. 775, 782 (D.Minn.1968).

**14.** *Evans v. Sheraton Park Hotel*, 164 U.S.App. D.C. 86, 503 F.2d 177, 182–84 (1974); *Macklin v. Spector Freight Systems, Inc.*, 156 U.S.App. D.C. 69, 478 F.2d 979, 993 n. 25 (1973) (dicta); *EEOC v. Painters Local 857*, 384 F.Supp. 1264, 1267 (D.S.D.1974); *Reyes v. Missouri-Kansas-Texas R.R. Co.*, 53 F.R.D. 293 (D.Kan.1971); *Torockio v. Chamberlain Mfg. Co.*, 51 F.R.D. 517 (W.D.Pa.1970); *Bremer v. St. Louis Southwestern R. R. Co.*, 310 F.Supp. 1333, 1339–40 (E.D.Mo.1969).

**15.** "We do not believe that the procedures of Title VII were intended to serve as a stumbling block to the accomplishment of the statutory objective. To expect a complainant at the administrative stage, usually without aid of counsel, to foresee and handle intricate procedural problems which could arise in subsequent litigation, all at the risk of being cast out of court for procedural error, would place a burden on

that the intent of the complaint process should not override the overall purpose of Title VII, to provide redress from employment discrimination:

"[W]e are not convinced that the value of conciliation supersedes the value of enforcement, to the end that after a charge has been processed before the EEOC and court action commenced, the district court is powerless to order joinder under Rule 19(a) and is further required to dismiss the action under the indispensable party provisions of Rule 19(b)." 503 F.2d at 183.

The Court concluded that the plaintiff had complied with the Title VII procedure sufficiently to confer jurisdiction on the Court.[16] Clearly, *Evans'* rationale supports the thesis that conciliation is subordinate to enforcement; thus, if the international union is essential to afford effective relief to a party, it may be joined in a Title VII action without having been a named respondent, if the union had actual notice of the charge.

In *Guerra v. Manchester Terminal Corporation*, 498 F.2d 641, 647 n. 6 (5th Cir. 1974), the United States Court of Appeals for the Fifth Circuit expressly declined to decide whether, or under what circumstances, a district court may hear a Title VII claim against a party who was not named a respondent before the E.E.O.C. It has not addressed the issue since *Guerra*. The district courts have divided sharply on the issue.[17] Two district judges have intimated that a non-respondent party may be sued under Title VII if he and the named respondent have a sufficient legal relationship and if he has actual notice of the charges.[18]

In *Taylor v. Armco Steel Corporation*, 373 F.Supp. 885 (S.D.Tex.1973), the plaintiff sued the local and international unions, but he had not named the international union in the charge he filed with the E.E.O.C. The "master agreement" between the employer and the international authorized local agreements like the one at issue in the case, and the international union knew of the offensive collective bargaining agreement. An international official had signed it. The Court held that the claim against the international union under Title VII was viable despite the procedural shortcoming due to the circumstances of the case and because the local union had represented the interests of the international adequately during the conciliation efforts.[19]

Clearly, the primary purpose of the administrative procedure is to obtain voluntary compliance within an overall policy to secure equal employment opportunities. If a Court cannot pursue the overall policy of equal employment without the joinder of a party not a respondent in the E.E.O.C. charge, or when strict construction of the § 706 procedure would prevent effective enforcement of the Act, the Court should excuse technical noncompliance and exercise jurisdiction over the faulty claim, especially when the complainant prepared the E.E.O.C. charge without the assistance of counsel. Moreover, if a party has a close legal relationship with a named respondent and has actual notice of the E.E.O.C. charge, to the extent that he could have

the complainant which Congress neither anticipated nor intended." 503 F.2d at 183.

16. "It is our conclusion that appellant Evans exhausted her administrative remedies as anticipated by Congress." *Id.*

17. *Compare Byron v. University of Florida*, 403 F.Supp. 49 (N.D.Fla.1975), *and Taylor v. Armco Steel Corp.*, 373 F.Supp. 885 (S.D.Tex.1973), *with Arnold v. Consolidated Freight Ways, Inc.*, 399 F.Supp. 76 (S.D.Tex.1975), *and Holiday v. Red Ball Motor Freight, Inc.*, 399 F.Supp. 81 (S.D.Tex.1974). For the conflict among other courts, *compare EEOC v. Painters Local 857*, 384 F.Supp. 1264 (D.S.D.1974), *with Butler v. Local No. 4*, 308 F.Supp. 528 (N.D.Ill.1969).

18. *Byron v. University of Florida*, 403 F.Supp. 49 (N.D.Fla.1975) (Stafford, J.); *Taylor v. Armco Steel Corp.*, 373 F.Supp. 885 (S.D.Tex.1973) (Seals, J.).

19. Judge Stafford noted the divergence of authority on the point, then opted in favor of the *Taylor* rule in *Byron v. University of Florida*, 403 F.Supp. 49 (N.D.Fla.1975). In that case he allowed the Title VII claims to be made against supervisory employees when only the University Physical Plant Division had been named in the E.E.O.C. charge.

participated in conciliation efforts, he should not be heard to cry "foul" when later made a defendant in the suit. Thus, if an international union knew of the collective bargaining agreement provisions and their effects, maintained supervision over the charged local, and had actual notice of the charge against the local, a federal district court has jurisdiction over the Title VII claims against it even if it was not a named respondent in the E.E.O.C. charge. The jurisdiction is especially firm if joinder of the international is necessary to grant effective relief to the complainant.

In this case, the International or its predecessor has been certified as the exclusive collective bargaining agent for production and maintenance employees of the Bastrop Plant of International Paper Company, Single Service Division, since at least 1958. Local 582 is a chartered local affiliate of the International. By its constitution, the International maintains supervisory control over Local 582. For example, it can force the Local into trusteeship for specified reasons,[20] and the International participates in and supervises contract negotiations.[21]

Contract negotiations begin when Local members propose terms to the International Representative, an advisor and liaison officer provided by the International Union, who advises them of regional contract provisions. Once the proposal is complete, the International Representative and Local officers negotiate the local contract as a team. The International Union participates in the grievance procedure once it progresses to the plant management stage.

The International Union was aware of the provisions of Local 582's contract and the general conditions of employment at the Single Service plant at Bastrop. The

International Representative at the time of the E.E.O.C. charges resulting in this lawsuit was Jerrell Thomason. He knew that the charges would be filed,[22] and he learned of the filing shortly after the E.E.O.C. notified the Local president.[23] He even may have received a copy of the charges at that time, but at the trial he could not recall whether he had received them.

The International maintained close supervisory affiliation with Local 582. Any conciliation efforts resulting in a change in the collective bargaining agreement would have required the consent of the International Union as exclusive collective bargaining representative. The International Representative held several discussions with Local officers concerning how to handle the complaints. The International maintained a close legal and supervisory relationship with Local 582, it knew of the collective bargaining agreement provisions, and it had actual notice of the charges filed with the E.E.O.C. and the conciliation efforts. The Court therefore has jurisdiction over the Title VII claims of the class against the International Union.

## INJUNCTIVE RELIEF

In their original and amended complaints, plaintiffs attacked the Unions' conduct for maintaining a segregated job classification system and segregated lines of progression. They also complained of the discriminatory effects of the departmental seniority system, as well as discriminatory work rules and conditions, quotas, and layoffs. Finally they charged that the Unions had failed to represent their female members fairly and adequately. They sought to enjoin the discriminatory practices and asked the Court to establish a temporary preference in favor

---

20. UPIU Const. art. XIII.

21. UPIU Const. art. XV, § 2: "Negotiations for collective bargaining agreements shall be subject to supervision by, and their terms, conditions and termination shall be subject to the approval of the International President."

22. Q. "Do you ever recall being informed before the charges were actually filed, Mr. Thomason, that they were going to be filed?"

A. "Yes, I do." Transcript, Vol. 1, p. 22.

23. Q. "To the best of your knowledge, does the local president receive notification from the EEOC, that the charges were filed, sir, then you would be notified by the local president; is that correct?"

A. "Yes, sir." Transcript, Vol. 1, p. 21.

of women employees in training, seniority and promotions.

Prior to the consent decree between the Company and the plaintiffs, the Company, the International and Local 582 reached a "supplemental agreement", now in effect, that remedied the discriminatory practices with respect to the female employees. A copy of the agreement is the Appendix to this opinion. The supplemental agreement renders a decision with respect to injunctive relief unnecessary, as the parties noted in section F(8) of their pretrial order.

## FINDINGS OF FACT

1. Named plaintiffs Frankie Wilson Stevenson, Ruthie Adams, Doris Roberts, Paula Thompson and Lois Hemphill all are adult female citizens of the United States and residents of Morehouse Parish, Louisiana. At the time of the trial all of them were employed or had been employed by International Paper Company, Single Service Division, at the Bastrop Plant. Frankie Stevenson began work at the plant on November 28, 1952, her seniority date, and was still employed there at the time of trial; she is the same as the Frankie Wilson on the E.E.O.C. charges, Plaintiffs' Exhibits 6 and 6A. Ruthie Adams' seniority date was November 5, 1962; she had worked at the plant briefly in 1949 and again in 1952. She still was working at the plant at the time of trial. Doris Roberts began work at the plant on August 1, 1961, and continued working there through the time of trial. She had worked at the plant previously in 1949 and 1958. Paula Thompson was hired on October 21, 1952, and was working at the plant at the time of the trial. Lois Hemphill came to work at International Paper on January 5, 1953. She retired due to disability on June 16, 1972, and she receives some form of compensation from the Company in the form of disability benefits.

2. On September 5, 1974, the Court certified the action as a class action. The class consists of all females who have been or are employed at the Bastrop Plant of the Single Service Division of International Paper Company.

3. The United Paperworkers International Union is the successor to the International Brotherhood of Pulp, Sulphite and Paper Mill Workers. It is an international labor union to which all the named plaintiffs and class members belong. The International is the exclusive collective bargaining agent for production and maintenance employees of International Paper at the Single Service Plant in Bastrop; it has more than 25 members, and it is a labor organization engaged in an industry affecting interstate commerce.

4. Local 582 is the successor to Burke Local 582 and a local labor union to which all the named plaintiffs and class members belong. It is affiliated with the International Union as a local union. It has more than 25 members and is a labor organization in an industry affecting interstate commerce.

5. Frankie Wilson Stevenson filed a charge with the E.E.O.C. against the Company and the Union on September 2, 1970. She filed a second charge on November 10, 1970. The E.E.O.C. sent her a right-to-sue letter on March 23, 1973.

6. Ruthie Adams, Doris Roberts, Paula Thompson and Lois Hemphill filed charges with the E.E.O.C. against the Company and the Union on November 10, 1970. The E.E.O.C. issued right-to-sue letters to all of them on March 2, 1973.

7. None of the complainants had the assistance of counsel in preparing their charges with the E.E.O.C. No attorney reviewed their charges prior to their filing.

8. The named plaintiffs commenced an action against International Paper, and Local 582 on April 2, 1973, later amending their complaint to add the International Union.

9. The principal function of the Bastrop Plant, Single Service Division, International Paper Company, is to manufacture milk cartons. Prior to 1965, the Company maintained no formal lines of progression in the manufacturing process.

10. The 1965 Labor Agreement, negotiated by the Company, the International Un-

ion, and Local 582, created departments with lines of progression. The departments were: Printing; Sealing; Converting; Shipping; Plate, Ink Room and Vulcanizing; Case Sealer; Maintenance and Machine Shop; Trucking; and Baler. The printed agreement, Exhibit D–14, diagrammed the lines of progression in three departments. The diagram is reproduced as Figure 1. It shows four lines of progression. The lines in the Converting Department and the Shipping Department, as well as line "A" in the Sealing Department, are connected to the category called "Extra Labor". The "Extra Labor" category consisted of the base rated jobs, or general labor. The significance of the connection was that, in times of curtailed production, persons bumped from the lines of progression connected to "Extra Labor" could bump into the base rated jobs rather than being laid off. Employees in line "B" of the Sealing Department could not bump into base rated jobs; instead, they were laid off, or "sent out the door".

SINGLE SERVICE DIVISION

BASTROP, LOUISIANA

FIGURE 1

11. The 1967 Labor Agreement, Exhibit D–16 extended the same organizational structure of the 1967–70 period.

12. During the term of the 1967 agreement, the Single Service Division moved into a more modern plant in Bastrop. The move prompted a restructuring of the lines of progression. In addition, the lines evolved a bit differently purely as a result of Union and Company negotiations. Figure 2 is a reproduction of the diagram of the reorganized lines of progression in the 1970 contract, Exhibit D–32. The Sealing Department became the Flamer Department. Significantly, the "B" line of progression became connected to the base rated jobs, so employees in that line could bump into base rated jobs in times of curtailed production.

13. The plan of organization illustrated by Figure 2 continued in effect during all times relevant to the instant case.

14. In section F(7) of the pretrial order the unions stated:

"The defendant Unions admit, by their answers filed herein, that plaintiffs and the class of employees they represent have been discriminated against with respect to segregation of jobs, segregation of lines of progression, and similar aspects of work assignments and opportunities. Defendant Unions admit that plaintiffs are entitled to relief for discrimination for which they suffered but to deny that any monetary relief is attributable to them."

FIGURE 2

15. The extent of the harm to the women due to sex discrimination is exemplified by wage data comparing men and women. As of November, 1973, the average wage for males at the Single Service plant was $188.40 per week, while the average wage for females was $117.15 per week. Exhibit P-2, Answers to Interrogatories 56 and 57. Moreover, Chart I shows the disparity between the gross earnings for 1968–75 for men and women with approximately the same plant seniority.

COMPARISON OF GROSS WAGES —
MALES TO FEMALES
1968 - 1975

| MALES | | | FEMALES | | |
|---|---|---|---|---|---|
| Name | Seniority Date | Gross Earnings | Name | Seniority Date | Gross Earnings |
| A.J. Johnston | 5/5/47 | $63,850.67 | Maybelle Richards | 5/5/47 | $50,830.50 |
| T.W. Hales | 3/15/49 | 57,926.29 | Dorothy Byrd | 11/8/48 | 42,823.75 |
| T.W. Hales | 3/15/49 | 57,926.29 | Gladys Heatherly | 3/7/49 | 50,903.70 |
| Harold McDaniel | 12/30/49 | 62,248.95 | Lonnie Howington | 9/5/49 | 40,631.43 |
| Thurston Adcock | 2/13/50 | 61,041.32 | Emma Kilpatrick | 2/6/50 | 52,988.12 |
| Harty Fife | 4/27/50 | 61,349.37 | Catherine Townsend | 5/23/50 | 50,007.99 |
| Claude Roberson | 9/14/50 | 39,860.05 | Etta Mann | 9/2/50 | 14,684.95 |
| Cubee Turner | 3/20/51 | 43,501.50 | Martha McLean | 8/8/51 | 31,764.66 |
| Harvey Echols | 5/31/51 | 58,188.31 | Urslia Bryan | 7/31/51 | 34,933.92 |
| Harvey Echols | 5/31/51 | 58,188.31 | Martha McLean | 8/8/51 | 31,764.66 |
| Wilburn Plyant | 9/6/62 | 41,365.78 | Ruthie Adams | 11/5/62 | 35,055.71 |

Chart I

16. The list of practices about which the female employees complained is long. They charged discrimination in initial job assignments, grievance procedure, assessment of union dues, reimbursement of lost time in connection with the lawsuit, the seniority system, the transfer procedure, job segregation in lines of progression, the promotions policy, demotion and lay-off procedures, the acquisition of seniority for "temporary set-ups", the demotion of employees during work stoppages due to mechanical failure, and retirement and disability payments.

17. The Unions, under the collective bargaining agreements, had no control over initial job assignment; hence, it is immaterial whether the Company discriminated against women in initial job assignments insofar as Union liability for job assignments is concerned.

18. During the course of the trial, plaintiffs' counsel attempted to show that the grievance procedure operated to produce adverse and discriminatory effects on women. For example, Jerrell Thomason, the International Representative from 1966 to 1972, testified that he did not recall a single female's grievance being taken to arbitration as provided in the contract. Upon cross-examination by the International's counsel, the following colloquy occurred:

"Q. Do you have any idea why that is so?

"A. If you will check this local has been successful in trying to work out many things with management, and due to the small size of the local and the cost of arbitration—I guess that they felt that it was not feasible to spend that kind of money to go to arbitration." Transcript at 36.

19. Several women testified at trial about their grievances. All of them were processed to final agreement or dropped by the employee. At least one grievance resulted in an addendum to the labor agreement. Doris Roberts had complained that women, at that time allowed to bump into base rated jobs during times of curtailed production, could not claim any base rated job once they turned one down. Some of the jobs apparently were too strenuous for some of the women, who wanted to be eligible for a less strenuous job should a vacancy occur. The grievance resulted in an addendum to the labor agreement:

"Employees who elect to go on layoff status rather than claim a base rated job for which they may be entitled to on the basis of plant seniority will be eligible for base rated jobs which may come open due to incumbents being temporarily promoted." Exhibit D–49.

20. There was no discriminatory inadequacy of the grievance procedure with respect to the women employees at the Single Service plant.

21. Several of plaintiffs' witnesses testified that Local Union dues had been raised to cover attorneys' fees in connection with the defense of this case. No substantial evidence fortified the allegation. The Unions will not be held responsible for any claim based on the increase in Local Union dues.

22. Local 582 paid its President, Cubee Turner, for time lost in assisting the Unions' counsels in preparing for trial. It did not pay the named plaintiffs for their time lost in assisting their attorney to prepare their case.

23. During the period prior to 1976, the Company and the Unions agreed to use job, departmental and plant seniority to determine entitlement to various employment advantages. The 1965 agreement defined all three terms, and the definition applied until plant seniority became the only seniority basis in 1976. Job seniority consisted of an employee's length of service on a particular job within a line of progression. Departmental seniority consisted of an employee's length of service in a particular line of progression. Plant seniority did and now does consist of an employee's length of service at the Single Service plant. Exhibit D–14.

24. Prior to and including the times relevant to this lawsuit, the Company hired women to work as feeders in their initial job assignment. The normal progression for women became formalized as the "flamer B" line of progression in the 1965 contract. The Company generally hired males into stacking jobs; from there they usually went to the lines of progression in the converting department or the flamer A line in the flamer department. The policy resulted in the flamer B line being all female and the other lines of progression being all male. Thus, women accumulated job and departmental seniority only in the flamer B line of progression. The flamer B line was the lowest paying line of progression at the plant.

25. Under the terms of the collective bargaining agreements, employees could transfer to a different line of progression only at the entry level job. Thus, an employee in a higher paying job in one line of progression generally would have to choose to receive less pay to transfer. Moreover, the transferring employee would lose his or her seniority in the former line of progression by transferring. For example, the 1973 Labor Agreement, Section VI(E), stated:

"Employees transferring from one line of progression to another, shall lose his seniority in his former line of progression after ninety (90) days on the new job classification." Exhibit D–61.

The loss of pay and seniority upon transfer to another line of progression operated effectively to lock female employees into the lowest paying line of progression at the Single Service plant.

26. The labor agreements provided for the promotions of employees. Prior to 1965 the Company selected employees for promotion on the basis of ability and seniority, with seniority prevailing if ability was equal.

27. The 1965 contract contained a more formal promotion policy. To fill a position in a line of progression above the entry level job, the company considered job, then departmental, and finally plant seniority. As a practical matter, no employee outside the line of progression in which the vacancy occurred could succeed in landing a job above the entry level. In fact, the contract forbid an employee transferring from one line of progression to another line of progression to enter above the entry level job.

28. Until 1970, women could not transfer into any line of progression but the flamer B line. After January 1, 1970, they could go into any line of progression when they were in a base rated job. They would lose their flamer B department seniority if they did so, however.

29. To fill an entry level position in a line of progression, the Company, pursuant to the labor agreement, looked to job, department and plant seniority, respectively.

Although women could have taken those vacancies, the "lock-in" transfer provision and the segregation of women into the flamer B line operated as practically insurmountable obstacles to taking advantage of the opportunities.

30. The segregation of women into the flamer B line, the use of job and department seniority to determine upper level and entry level job placement, and the discouraging transfer provision combined, as a practical matter, to deny women the equal opportunity to be promoted in more advantageous lines of progression than the flamer B line.

31. Prior to 1970, females with greater plant seniority could not bump males with less plant seniority from base rated jobs in times of curtailed production. The inability to bump into base rated jobs caused the women to take layoffs instead, resulting in great economic harm. The procedure had a long history with implications concerning the possible back pay claims and claims due to reduced retirement and disability benefits.

32. In an interpretation of the 1958 labor agreement, the Company agreed to follow a policy based on plant seniority:

"Employees demoted back to the base rate will use their Bastrop plant total length of service by bumping the employee with the least amount of Bastrop plant seniority. If two or more employees are so demoted at the same time, the employee with the greatest amount of plant seniority will be given preference as to departments where jobs have been vacated by the bumped employees." Exhibit D–5.

33. The 1962 contract had a similar provision:

"Employees demoted back to the base rate may first use his plant seniority to claim a stacker's job. If his plant seniority does not permit him to claim a stacker's job he will be permitted to claim any other base rate job his plant seniority entitles him to. The stacker who is bumped by this procedure will use his

plant seniority to claim other base rate jobs in the plant." Exhibit D–11.

34. The policy prior to 1964 enabled males to bump females out of feeder jobs. Because those were the only jobs women could hold at that time, they were laid off considerably more than the men. After the women complained, the local union voted not to allow men to bump into the feeder job.

35. The 1965 contract contained a contradiction. The diagram in the back of the published contract, Figure 1, *supra,* purported to show that the sealer B line did not connect to the base rate, or "Extra Labor", jobs. The figure implied that the sealer B line employees, *i. e.,* the women, could not bump into base rated jobs at all, forcing them to be laid off while junior males could still work by bumping from other lines into the base rated jobs. On the other hand, the contract language did not make the distinction between the sealer A and sealer B lines:

> "Employees in the Printing and Sealing Departments demoted back to the base rate must first use his plant seniority to claim a stacker's job. If his plant seniority does not permit him to claim a stacker's job he will be permitted to claim any base rate job his plant seniority entitles him to." Exhibit D–16.

Perhaps because the women could not be stackers at that time, the conflict was resolved in favor of the men, and women continued to be laid off in disproportionate numbers.

36. The 1967 labor agreement continued the demotion and layoff scheme of the 1965 contract. However, during the term of the 1967 contract, the International Representative contacted the Company concerning the procedure, arguing on behalf of the women. As a result of his efforts, women were allowed to bump into stacker's jobs beginning early in 1970, prior to the negotiations for the 1970 contract.

37. The lay-off problem became history in the 1970 contract. The flamer B line became connected to the base rated jobs and the women could bump into those jobs based upon plant seniority.

38. On April 24, 1972, Catherine Townsend filed a grievance alleging that women were being treated differently than men with respect to pay and work assignments on the half-gallon milk carton machine. When the machine malfunctioned and required repair, the operator and assistant operator, both males in the flamer A line, were allowed to continue working on the machine, blowing it dry. They received their operator and assistant operator wages while cleaning the machine. The female from the flamer B line who had been working with them on the machine was demoted and was not paid her regular wage. The International Representative told Mrs. Townsend that she would not profit from the demotion of the men. While that is true, she could have profited had she also been paid her regular wage even if her job assignment otherwise would have been considered a demotion.

39. The retirement plan at International Paper depends largely upon the total wages earned by an employee. Hence, if an employee has reduced total wages due to a contract provision, she will suffer reduced wages and reduced retirement benefits. All the disadvantages to the female employees not only reduced their current income but also reduced their retirement benefits. The loss of those benefits is a substantial economic penalty for being female, and it is a direct effect of the collective bargaining agreement provisions.

40. Several of the plaintiffs' witnesses complained that men were allowed to achieve job seniority when placed in temporary vacancies without achieving the particular job classification. They claimed that the men received recall rights based on these "temporary set-ups", to the prejudice of female employees, who were unable to avail themselves of the supposed "temporary setups". The evidence was very slight and confusing with respect to this contention. Plaintiffs failed to prove by a preponderance of the evidence that such a situation existed.

41. All collective bargaining agreements from 1956 through the time of trial had been signed by representatives of the International Union and Local 582.

42. Both Local 582 and the International Union were aware that female employees were being laid off while junior males continued to work. Both Unions knew that until about the time the women filed charges with the E.E.O.C., women could work in only one line of progression, the lowest paying line.

43. The female employees had been concerned about the seniority provisions for at least 15 years prior to trial. Their greatest concern was about being laid off while junior males worked. They attended numerous Local Union meetings and *ad hoc* meetings with Company and Union officials, attempting to achieve a greater sense of equality in earnings. Beginning about October, 1967, the Unions began to act. On October 23, 1967, the Local 582 president stated that he would contact the International Representative about the problem. On November 20, 1967, the International Representative, Jerrell Thomason, met the ladies to discuss the possibility of their ability to bump into stacker's jobs. The controversy continued for some time. On February 23, 1969, the Local membership, by tie vote, defeated a motion to allow women to bump into base rated jobs according to plant seniority. The problem still existed as late as July 20, 1970, when Jerrell Thomason met with several of the ladies to discuss it once again. Shortly after that meeting the women decided to file charges with the E.E.O.C.

44. During the period 1965 to the trial date the Unions, both Local and International, had made some efforts to alleviate the economic woes of the female employees at the Single Service plant. The International Union sent advice and instructions to local officers. In 1968 and again in 1973 the Company and the Unions agreed to apply a "Jackson Memorandum of Understanding" to remedy discrimination against black employees. Neither the Company nor the Union made any attempt to apply the "Jackson Memorandum" to women as well as blacks. The result of these efforts was that until the supplemental agreement resulting from the consent decree between the plaintiffs and the Company in this case many of the major areas of unequal treatment of women were not attacked aggressively by the International Union or Local 582. Thus, many of the unequal practices continued in effect.

45. The International Union, Local 582 and the Company negotiated the collective bargaining agreements for the Single Service plant at Bastrop. The first step in the Unions' side of the negotiations occurred when the Local membership made suggestions for inclusion in the contract to the bargaining committee. The International Representative also would contribute ideas by explaining any new developments in the Southern Craft Division negotiations.[24] Then the bargaining committee met to draft a proposed agenda to present to the membership, which voted on the final agenda to be presented to management. Finally, the International Representative and the bargaining committee negotiated with the Company. The International and Local negotiators worked as a team in presenting the Union proposals.

46. In the 1967 and 1970 contract negotiations, the Union negotiation team had the opportunity to propose alteration of the seniority system to alleviate its effects on female employees. The women suggested to Jerrell Thomason that he bring up the seniority issue in the 1967 negotiations. In the sessions, the Company advised Mr. Thomason that he should get a formal proposal from the Union to place the issue on the agenda. He never got the proposal. In the 1970 negotiations the union succeeded in getting the Company to connect the flamer B line to the base rated jobs to prevent the adverse lay-off system that existed prior to 1970.

24. The Southern Craft Division is a group of International Paper Mills joined together for collective bargaining purposes. The Bastrop Single Service plant is not a member.

47. During the 1973 contract negotiations the Company proposed to allow demoted employees to bump into any job on the basis of plant seniority. The Union team succeeding in altering the plan so that demoted employees could not displace employees who were permanently classified. Also, prior to the 1973 negotiations the Company and the Unions discussed altering the seniority system to make eligibility for more jobs dependent on plant seniority. The proposal did not materialize at the bargaining table.

48. The Unions did not propose that plant seniority be made the sole basis for layoffs and promotions until late 1975. Plaintiffs' counsel questioned Jerrell Thomason, the International Representative for the bulk of the time period covered by this lawsuit:

> "Q. Did you ever propose, or to your knowledge did the Union ever propose that plant seniority, and this would be at any time that is shown in these documents, Mr. Thomason, to be made the sole basis for layoffs and promotions?
>
> "A. Yes. I believe that the contract itself states that plant seniority will govern in the layoff situation. If you are asking me if we proposed plant seniority as the only seniority used in promotions and demotions in the line of progression? Is that what you are asking?
>
> "Q. Yes sir.
>
> "A. Then to my knowledge, and this would be during the period that I was there, we did not." Transcript at 470–71.

## CONCLUSIONS OF LAW

1. The named plaintiffs timely filed their charges with the E.E.O.C. 42 U.S.C. § 2000e–5(e). Upon receipt of the notice of right to sue from the E.E.O.C. the named plaintiffs timely commenced this civil action. 42 U.S.C. § 2000e–5(f)(1). The Court therefore has jurisdiction over the claims against the International Union and Local 582 by plaintiffs and the class they represent pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. 42 U.S.C. § 2000e–5.[25]

2. The Court has personal jurisdiction over the International Union and Local 582. Moreover, the plaintiffs commenced this action in a Court of proper venue.

3. Defendants United Paperworkers International Union and its Local 582 are labor organizations in an industry affecting commerce within the meaning of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e(d), (e).

4. Section 703(c) of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–2(c), describes unlawful employment practices of labor organizations. The statute, in pertinent part, states:

> "(c) It shall be an unlawful employment practice for a labor organization—
>
> \* \* \* \* \* \*
>
> "(2) to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or
>
> "(3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section."

5. A plaintiff class in an employment discrimination case need not prove discriminatory intent on the part of a labor organization; it may prove unlawful employment practices by showing a disparate effect on a group that claims to have been mistreated due to its race, color, sex, reli-

---

**25.** The Court, *supra,* already has resolved the jurisdictional question with respect to the International Union.

gion or national origin. *Griggs v. Duke Power Company,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Clearly, the following employment practices had an adverse impact on female employees as opposed to male employees at the Single Service plant in Bastrop:

(a) the segregation of women into the lowest paying line of progression at the plant, the flamer B line;

(b) the use of job and departmental seniority for promotion eligibility, as women were unable to become eligible for higher paying jobs in other lines of progression;

(c) the loss of departmental seniority upon transfer to a new line of progression, as women then became "locked in" to the flamer B line, the lowest paid line at the plant; [26]

(d) the denial to women, but not to men, of the right to bump into base rated jobs during times of demotion due to curtailed production;

(e) the demotion of women, but not men, when the half-gallon milk carton machine malfunctioned; and

(f) the payment of funds pursuant to the negotiated retirement payment plan, to the extent that it depended on total employee earnings, as the impact of the other practices caused women to have lower earnings than their male counterparts.

7. The Unions produced no evidence to rebut or explain the discriminatory disparity. In fact, they admitted that the practices discriminated against women on the basis of sex.

8. All of the discriminatory practices resulted from the provisions or interpretations of collective bargaining agreements negotiated by the Company and the Unions. Both the International Union and Local 582 signed all collective bargaining agreements from 1956 through the time of the trial.

9. The discriminatory practices constituted unlawful employment practices by a labor organization pursuant to 42 U.S.C. § 2000e–2(c)(2).

10. The International Union and Local 582 assert that they may not be liable for back pay to the class due to a "business necessity" defense. They do not assert that any business reason justified the discriminatory practices. Rather, they claim that the nature of the union-employer relationship gives rise to a "union function" defense.[27] The essence of the defense is that a union that has sought reform in employment practices zealously, although unsuccessfully, is relieved of back pay liability to the employees.

11. While this case was under advisement, the United States Court of Appeals for the Fifth Circuit rendered a decision greatly clarifying the scope and extent of union liability for back pay under Title VII. The decision, *Myers v. Gilman Paper Company,* 544 F.2d 837 (5th Cir. 1977), does not purport to pronounce new standards of conduct for unions in equal employment opportunity cases, it merely seeks further to articulate and clarify existing standards. Thus, it should be applied to the instant case even though it was rendered after this case was submitted to this Court for decision.

12. In *Myers* the plaintiff classes complained of racial discrimination primarily in the promotion and transfer provisions of the collective bargaining agreements between the company and the unions that represented the employees. In that case, as in this one, the plaintiffs contended not that the provisions by their terms discriminated against employees due to their race, but that the provisions perpetuated the effects of past practices. At trial the evidence sustained their contention. Prior to trial

---

**26.** *E. g., Hairston v. McLean Trucking Co.,* 520 F.2d 226 (4th Cir. 1975); *EEOC v. Detroit Edison Co.,* 515 F.2d 301 (6th Cir. 1975); *Rodriguez v. East Texas Motor Freight,* 505 F.2d 40 (5th Cir. 1974), *reh. denied,* 518 F.2d 1407 (5th Cir. 1975); *Papermakers Local 189 v. United*

States, 416 F.2d 980 (5th Cir. 1969); *Taylor v. Armco Steel Corp.,* 373 F.Supp. 885 (S.D.Tex. 1973).

**27.** *See Myers v. Gilman Paper Co.,* 544 F.2d 837, 849 (5th Cir. 1977).

the plaintiffs and their employer agreed on a consent order containing a back-pay award and other injunctive relief, leaving the issues open with respect to the unions. Over union objections the district court approved the consent decree and assessed back pay liability against the unions, apportioning the award 50% to them and 50% to the company.[28] The unions appealed.

13. In its argument before the Court of Appeals in *Myers* the United Paperworkers International Union, the same International Union involved in this case, contended that a union states a defense if it urged the employer to comply with Title VII and took a positive bargaining position toward that end but lacked the bargaining power to obtain employer agreement. The Fifth Circuit categorically rejected the argument insofar as it related to the Stage I proceeding:

> "This argument is not relevant to the primary issue below—whether a defendant is or has engaged in conduct that discriminates on the basis of race or that perpetuates past discrimination. Rather, the argument is germane as to which defendant should bear primary responsibility for the illegal conduct. The court did not err in holding that UPIU had no 'business necessity' defense." 544 F.2d at 849.

The obvious implication from *Myers* is that a union that supervises or participates in a collective bargaining process that results in an agreement containing provisions that discriminate or perpetuate the effects of past discrimination on the basis of race or sex is liable for back pay to the employees on the basis of the participation or supervision. The attempts by the Union to alter the contract are irrelevant *as against the employee.*

14. That the unions should be liable for back pay to their members who have been victimized by sex or racial discrimination does not mean that the unions must bear the ultimate financial burden, or even some of it, in all cases. Judge Gewin, in the *Myers* opinion, specifically approved the district court's preliminary apportionment of back pay liability between the employer and the unions:

> "The 50% ruling thus appears to be a preliminary ruling, perhaps thought desirable for back pay proceedings because a portion of the back pay claims had to be attributed to the company's settlement. The district court correctly viewed the company and the unions as joint wrongdoers whose concurrent acts caused plaintiffs' injuries. [Citations omitted.] The proceeding below appears properly to have been limited only to defendants' liability to plaintiffs, for a complex factual determination of the defendants' relative culpability should not interfere with plaintiffs' case." 544 F.2d at 850.

Thus, the ultimate financial burden of back pay liability should be apportioned through the assertion of cross-claims of contribution or indemnity between the unions and the company. The fair and adequate representation of the unions should be tested at the cross-claim stage; if the unions discharged their duties of fair and equal representation, they should recover their share of the back pay claims from the company. Because this Court has dismissed the cross-claims between the Unions and the Company in this case, the Unions simply have no forum in which to assert the "union function" defense.

15. *Myers* puts the onus of proof where it belongs. Individual employees, especially minority group members, are not privy to collective bargaining planning and negotiations. Their ability effectively to refute a claim by the company or the union that the other bargaining party resisted its efforts to promote equality is severely limited as a practical matter. The company and the union, on the other hand, have several representatives present at each bargaining ses-

---

28. Three different unions represented various class members; thus, the district court also had to apportion the 50% among the three unions.

sion; they best are able to testify about the proposals made by each side and the reactions to them. If the collective bargaining agreement imposes ill effects on persons due to their sex or race, the company and the union must bear the burden of proving which entity is the more culpable. And that burden should be borne at the cross-claim stage, after a determination of the total back wages to which each class member is entitled.

16. In this case the adverse economic effects visited on the class of female employees derived directly from the provisions of the collective bargaining agreements to which the Company, the International Union, and Local 582 were parties and signatories. Clearly the Unions are liable to the class for back pay resulting from the discriminatory provisions.[29]

17. The International and Local 582 operate as a single entity as a practical matter. Together they constitute one side of the table in collective bargaining sessions. With respect to the back pay liability to employees, then, they should be considered together as one joint wrongdoer. Thus, they should bear one-half the burden, not two-thirds the burden, as if each were a separate wrongdoer.

18. The class suffered economic harm due to the discriminatory practices perpetuated by the collective bargaining agreements. Once such economic harm is proven, a Court should award back pay absent special circumstances. *Mims v. Wilson*, 514 F.2d 106 (5th Cir. 1975). No special circumstances to relieve back pay liability exist in this case.

19. The Court concludes that the International Union and Local 582 are liable to individual members of the class for back pay claims caused by the unlawful employment practices listed in Conclusion of Law 6. The amount later found to be due to each employee shall be reduced by one-half,

considering the settlement with the Company.

## PLAINTIFFS' ATTORNEY'S FEES AND COSTS

Section 706(k) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(k) provides:

> "In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee as part of the costs, and the Commission and the United States shall be liable for costs the same as a private [party]."

Undoubtedly the plaintiff class is the prevailing party within the meaning of the statute. The Court exercises its discretion to award it a reasonable attorney's fee.

The United States Court of Appeals for the Fifth Circuit has established guidelines in the form of a list of factors to consider to determine what a reasonable attorney's fee is in a particular case. The factors, according to *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974), include the time and labor required, the novelty and difficulty of the questions, the experience, reputation and ability of the attorney, the amount involved and the results obtained, and the nature and length of the professional relationship with the client.

Stephen J. Katz, plaintiffs' counsel, managed the entire class action by himself. Over a three-year period, up until the trial, he had expended over 200 hours in preparing the case. The novelty of the union liability question required much research, until the *Myers* case resolved it rather easily. The management of the case required great skill, aplomb, patience and persistence. Mr. Katz obtained remarkable results, in the form of a supplemental agreement incorporated into the consent decree, to alleviate the discrimination prospectively as to both the Company and the Union, and he obtained a settlement between the class and the company prior to trial. He is an

---

**29.** Indeed, the UPIU did less in this case to ease discrimination than it had done in *Myers*. In *Myers* the union even had struck in an unsuccessful attempt to alleviate some of the discriminatory practices. *Myers v. Gilman Paper Co.*, 544 F.2d 837, 844–45 (5th Cir. 1977).

experienced civil rights attorney, having been involved in a number of employment discrimination cases. Based on all of these factors, the Court has determined that a reasonable rate for his services would be $50 per hour.

Exhibit P–71 detailed plaintiffs' counsel's time in preparing for trial. At trial, plaintiffs' counsel acknowledged that certain entries did not pertain to the Unions. Thus, the following entries should not be considered in the attorney's fee award:

| DATE | EVENT |
|---|---|
| 4/23/74 | Receipt of motion to extend filing time by I.P. and telephone conversation with Judge Dawkins thereon |
| 6/26/74 | Receipt and review of I.P.'s opposition to intervention of EEOC |
| 9/4/74 | Preparation of hearing of 9/5/74 |
| 9/5/74 | Appearance at court hearing |
| 10/1/74 | Preparation of motion to inspect premises |
| 10/1/74 | Review of file |
| 1/24/75 | Letter to clerk re motion to compel answers to interrogatories |
| 2/25/75 | Preparation for hearing on motion to compel answers to interrogatories to defendant I.P. |
| 2/26/75 | First appearance at hearing on motion to compel answers to interrogatories |
| 5/20/75 | Motion to compel answers to interrogatories to defendant I.P. and memorandum in support thereof |
| 7/10/75 | Letter to I.P. counsel |
| 7/11/75 | Letter to I.P. counsel |
| 12/23/75 | Preparation of opposition to I.P.'s interrogatories and research thereon. |
| 1/20/76 | Settlement discussions with I.P. counsel |
| 6/23/76 | Motion to amend consent decree |
| 6/25/76 | Preparation to mail second class settlement notices |
| 6/25/76 | Telephone conversation with defendant I.P.'s counsel |

Deleting the entries not attributable to the case against the Unions, plaintiffs' counsel spent 198.25 hours working on the case. A reasonable fee for his services is $9,912.50. Plaintiffs hereby are awarded $9,912.50 as a reasonable attorney's fee. The remaining costs shall be taxed by the Clerk of Court.

## FURTHER PROCEEDINGS

Having found the International Union and Local 582 liable to the class for back pay, the Court must attend to the determination of back pay awards to individual class members and to the disbursement of funds deposited in the Registry of the Court pursuant to the consent decree.

In a Title VII action in Louisiana, back pay claims may run from one year prior to the date of the filing of charges with the E.E.O.C. until either the date a judgment is paid or the discriminatory practice ends. *Boudreaux v. Baton Rouge Marine Contracting Co.*, 437 F.2d 1011 (5th Cir. 1971); La.Civ.Code art. 3534. The first charge filed with the E.E.O.C. was that of Frankie Wilson Stevenson; she filed a charge on September 2, 1970. Hence, back pay claims may accrue from September 2, 1969. The discriminatory practices concluded with the supplemental agreement negotiated in conjunction with the consent decree in this case. The effective date of the supplemental agreement was August 20, 1975. Individual class members may assert back pay claims for economic consequences of the declared unlawful employment practices from September 2, 1969, to August 20, 1975.

The Unions are liable only for the economic effects of those practices that the Court declared unlawfully to have discriminated against women. No class claimant for any other practice may recover back pay from the Unions. Hence, Stage II will be limited to individual class members who claim to be entitled to back pay as a consequence of the following employment practices:

(1) the segregation of women into the flamer B line of progression;

(2) the use of job and departmental seniority to determine eligibility for promotion;

(3) the loss of departmental seniority upon transfer to a new line of progression;

(4) the inability of women to bump into base rated jobs when demoted due to curtailed production;

(5) the demotion of women when the half-gallon milk carton machine malfunctioned; and

(6) the loss of retirement benefits to women due to their lower earnings resulting from the other listed discriminatory practices.

To insure adequate notice to individual back pay claimants, a notice to class members shall issue, within 20 days of service of this opinion on defendants, to inform potential claimants of their right to pursue their claims against the Unions. The Unions shall pay the costs of sending the notice by registered mail to each class member. Each class member shall have 30 days from the date of the notice to inform the Court, in writing, that she is a member of the class, that she is entitled to relief, and that she intends to pursue her claim against the Unions. Each class member, in the notice to the Court, also shall specify the particular discriminatory practice or practices alleged to have caused her economic harm. The specification will aid counsel in initial preparation of the Stage II claim. It will not bind the claimant to the specified practices only. Enclosed with the notice shall be a form for response to the Court, with a pre-addressed envelope in which to return the form.

The notice to individual class members shall read:

### "NOTICE TO CLASS

"TO: All females who have been or are employed at the Bastrop Plant of the Single Service Division of International Paper Company

"RE: Back pay claims against United Paperworkers International Union and Local 582, United Paperworkers International Union

—————, 1977

"On April ——, 1977, Judge Tom Stagg ruled that the International Union and Local 582 are liable in back pay to the class represented by Frankie Wilson Stevenson and others in Civil Action No. 18,877, United States District Court, Western District of Louisiana, Monroe Division. Judge Stagg ruled that female employees who lost pay between September 2, 1969, and August 20, 1975, due to certain discriminatory employment practices could recover that pay, upon successfully proving their claims, from the unions.

"The six practices declared discriminatory are:

"(1) The segregation of women into the flamer B line of progression;

"(2) The use of job and departmental seniority to determine eligibility for promotion;

"(3) The loss of departmental seniority upon transfer to a new line of progression;

"(4) The inability of women to bump into base rated jobs when demoted due to reduced work or production;

"(5) The demotion of women when the half-gallon milk carton machine broke down; and

"(6) The loss of retirement benefits to women because they earned less, as a result of the other listed discriminatory practices.

"If you think that you suffered reduced pay or retirement benefits due to any of the practices on the list, you must fill out the enclosed form and send it to the Clerk of Court in the enclosed pre-addressed envelope within 30 days of the date of this notice (by ————, 1977).

"If you do not complete the form and send it in by ————, 1977, you will be unable to get any money from the Unions due to the law suit.

"After receiving your forms back, the Court will get in touch with you about proving your claims.

Robert H. Shemwell
Clerk of Court
United States District Court
Western District of Louisiana
P.O. Box 106
Shreveport, LA 71161"

The form for notifying the Court of an intention to pursue a back pay claim shall read as follows:

"NOTICE OF INTENTION TO MAKE A BACK PAY CLAIM AGAINST UNITED PAPERWORKERS INTERNATIONAL UNION AND/OR ITS LOCAL 582

Frankie Stevenson, et al versus International Paper Company, et al, Civil Action No. 18,877, Monroe Division, Western District of Louisiana

"I, _____, hereby declare
 (name)
that I intend to pursue a back pay claim against the Unions in the above-referenced case.

"I suffered a loss in pay between September 2, 1969, and August 20, 1975, due to the employment practice(s) checked below (check the practice or practices that you think caused you the loss in pay):

"____ The segregation of women into the flamer B line of progression.

"____ The use of job and departmental seniority to determine eligibility for promotions.

"____ The loss of departmental seniority upon transfer to a new line of progression.

"____ The inability of women to bump into base rated jobs when demoted due to reduced production.

"____ The demotion of women when the half-gallon milk carton machine broke down.

"_____ The loss of retirement benefits to women because they earned less, as a result of the other listed discriminatory practices.

Date: _____, 1977

_____
(print your name)

_____ "
(sign your name)

After the 30-day notice period expires, the Court will allow counsel for plaintiffs and defendants 90 days to prepare to present and rebut the individual claims for back pay. Then it will set the case for trial on the individual claims.

The United States Court of Appeals for the Fifth Circuit recently has outlined the burdens of proof in the Stage II trials of employment discrimination cases. The individual claimant first bears the burden to show (1) that she is a member of the class, and (2) that she suffered deleterious economic consequences as a result of the unlawful employment practices. *Mims v. Wilson*, 514 F.2d 106 (5th Cir. 1975); *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 259-60 (5th Cir. 1974). In a race discrimination case, *Myers v. Gilman Paper Company*, 544 F.2d 837, 854 (5th Cir. 1977), the Court described the kind of proof that would be probative of the back pay claim:

"The individual claimant should be required to come forward with a statement of his current or last position and pay rate thereof, the jobs he was denied because of discrimination and their pay rates, a record of his employment history with the company and other evidence that qualified or would have qualified him for the denied position, and an estimate of the amount of requested back pay."

Once the individual claimant has made her required showing, the burden shifts to the defendant to relieve itself of liability. The only defenses at this stage will be that the economic loss resulted from some factor other than unlawful discrimination, such as a lack of qualifications, or that the loss resulted from some policy or practice not proven to be discriminatory in Stage I. The business necessity or bona fide occupational qualification defenses, available at Stage I, are not available at the Stage II proceeding. *Myers v. Gilman Paper Co.*, 544 F.2d 837, 854 (5th Cir. 1977).

At Stage II, the individual claimants in this case must prove that they are members of the class entitled to judgment and that they suffered an economic loss due to one of the six practices the Court declared to be unlawful. The burden then will shift to the defendant Unions to prove that the loss did not result from discrimination. As in Stage I, the "union function" defense will not be relevant as against the employees.

A sum of $30,000 remains in the Registry of the Court as the monetary settlement between the Company and the class, as provided in the July 29, 1976, consent decree. According to the decree, the disbursement of the fund shall be set by the Court. To determine the amount due to each claimant out of the fund the Court will apply the employee's percentage of the total recovery against the Unions to the fund. The product of the multiplication will be the amount due each claimant from the settlement fund. The Court will then authorize the Clerk of Court to disburse the fund.

## APPENDIX

### SUPPLEMENTAL AGREEMENT

This Supplemental Agreement is made and entered into by and between the Bastrop Plant of International Paper Company, Single Service Division, and the United Paperworkers International Union and its Burke Local No. 582.

The parties having duly met to discuss and negotiate changes to the practices under the existing labor agreement do hereby agree as follows:

I. A. The revised production lines of progression are as shown in Exhibit A attached hereto.

B. Plant Seniority is recognized as the basis for determining among qualified employees a promotion or demotion within the line of progression or transfer from one line of progression to another, or, promotion or demotion among jobs not in a line of progression.

C. Bid notices for permanent vacancies (i. e. quit, termination, retirement, etc.) and temporary vacancies which are known to be 30 days or more duration in the entry job of lines of progression and on jobs not in lines of progression will be posted on the plant bulletin board for 3 days and a copy of such bid notice will be given to the local union.

D. The following procedure will be in effect for filling temporary vacancies of less than 30 days (1) for all jobs not in lines of progression and (2) entry level jobs in lines of progression.

1. During the first week following the effective date of this agreement, all entry jobs in lines of progression and all jobs outside lines of progression will be posted. Employees interested in filling temporary vacancies as defined above on the shift where the vacancy occurs will complete a pre bid identifying those jobs in which they are interested in completing. During the second full week after the effective date of this agreement, pre-bid slips for each job will be posted listing the names of all employees who completed a pre-bid slip for each job. Employees will be required to limit their pre-bid choice to two jobs.

2. Following the first pre-bidding procedure under this agreement, pre-bid slips will be completed for each job during the first full two weeks of January each year. The pre-bid lists for the previous year will no longer be in effect after January 31st. Any employee who wishes to compete for a pre-bid job will be required to indicate so by signing a pre-bid slip during the posting period. Competition based on new pre-bid slips will become effective February 1st of each year.

3. If no employees have signed the pre-bid list for a job and a temporary vacancy occurs in such a job, the vacancy will be filled by the most senior qualified available employee. During a bid posting period, the vacancy will be filled, if necessary, with the most qualified available person.

II. Residency Requirements

Residency requirements for each entry level production job in a line of progression have been established by the parties as reflected on Exhibit A. The residency requirements as established for each classification will be used when considering which employees are eligible for promotional consideration to levels above the entry level job in a line of progression. When calculating the time spent on a particular job for purposes of determining when the residency requirement has been satisfied, the following will apply:

A. Time worked while permanently or temporarily assigned to the job in question will be counted.

B. In establishing residency requirements for job classifications, the complexity of the jobs were considered in order to arrive at the number of work days on a job within a specified period of time which is necessary to ensure adequacy of experience on that job.

C. Time worked on temporary assignments to jobs above an employees permanent job will be counted toward residency requirements on the employees permanent job.

D. Time worked on either a permanent or temporary basis as outlined above shall satisfy residency requirements as follows:

Eight hours worked consecutively shall satisfy one day of residency.

In computing residency requirements, time worked through the end of a work week will be reviewed by Wednesday of the following week to determine which employees have met residency requirements and those determined to have met requirements will be eligible for promotional consideration beginning at that time.

III. Promotion and Demotion (Within a Line of Progression)

A. When either a permanent or temporary vacancy occurs, the following employees, if qualified, will be considered to fill the vacancy.

(1) Any employee permanently working on the job immediately below the vacant job who has satisfied the residency requirements of the job at which he is working, or

(2) Any employee who has satisfied the residency requirements of the prerequisite job immediately below the vacancy.

B. If no employee has satisfied the residency requirements outlined in A(1) or (2), the promotion will be made using the seniority principles in Item I(B) above. In this event the Company will honor present language in the filling of temporary vacancies within lines of progression, i. e., when a temporary vacancy occurs within a line of progression it will be filled by the employee having the most applicable seniority if such employee is properly qualified to maintain satisfactory performance standards in the temporary opening. If the oldest employee is not qualified, the next oldest will be given the setup and so on. Urgent situations will arise, and these will be handled as good management may dictate. However, the Management will keep in mind the spirit and basic intent of this idea on temporary promotions and will not let emergency steps, out of harmony with this intent, remain in effect more than the week in which the temporary vacancy occurs, this refers to shift setups. This paragraph refers to temporary promotions within a line of progression only.

C. Any employee who has previously waived a promotion or who during the effective period of this agreement shall waive a promotion and subsequently requests reinstatement for the right to advance, shall not be entitled to bypass an employee who bypassed him/her while the waiver was in force.

D. In the event of demotions, employees temporarily working on a job may displace other employees temporarily working on said job. However, employees temporarily working on said job will not be permitted to displace permanent employees from their permanent jobs.

IV. Recall Rights

Employees having recall rights to a job in a line of progression based on previous permanent assignments in such line will be given priority for promotion to such job provided he or she has not been permanently removed from the line of progression.

V. Curtailments

A. The following procedure will be applicable when employees are demoted from lines of progression or demoted from a job outside lines of progression because of curtailment and the curtailment is expected to last at least beyond the first day of the next scheduled work week. In curtailments of lesser periods, the junior employees will be laid off.

Employees will bump the junior employee in the order of the following classifications provided they can compete successfully on the basis of plant seniority and ability.

Shipping Checker
Towmotor Operator
Material Handler
Baler
Auto Pack Packer
Auto Stack Stacker
Packer
Relief
Miscellaneous (Base Rated Jobs)

Employees who do not wish to claim the job their plant seniority entitles them to may claim an Auto Pack Packer's job if their plant seniority entitles them to before claiming a base rated job.

Promotions in a curtailment will not be allowed.

The practice of not allowing job refusals in curtailments will be continued.

B. The procedure outlined above will be applicable when employees are demoted because of a curtailment and the curtailment is expected to last until the next scheduled work week. Cross-shift bumping will apply at the start of the next scheduled work week.

VI. The Company shall give notice of this Supplemental Agreement to all employees by posting copies of it in each department. The Union and the Company shall cooperate in explaining this agreement to all employees.

VII. Term of Agreement

A. This agreement shall become effective immediately and shall remain in effect for the term of the current Labor Agreement between the parties.

B. The provisions of this agreement shall supersede and replace any and all conflicting terms or provisions of the current Labor Agreement between the Company and the Union and/or side agreements which are currently in effect between the Company and Union.

In Witness Whereof, the undersigned have, as the accredited representatives of the respective parties to this Agreement, set their signatures on the day and year indicated.

For the United Paperworkers International Union

(s) Norman Murphy
Norman Murphy, International Representative

Local 582

(s) Eugene Copeland President 582

(s) Maybelle Richards

(s) Arthur F. Carter Vice Pres.

For International Paper Company—Single Service Division—Bastrop Plant

(s) Allen C. Barham
Regional General Manager

(s) J. W. Myers
Plant Manager

(s) D. C. Coates
Plant Superintendent

## STATEMENTS OF UNDERSTANDING

1. There shall only be one type of Seniority (Plant Seniority).

2. Existing job refusal records will be cancelled and all employees will have the right to utilize their plant seniority to fill vacancies as outlined in IA, B, C, and D.

3. Permanent vacancies are deemed to exist when a new job is created or when an employee dies, retires, or otherwise leaves the employ of the Company.

4. Permanent vacancies within a line of progression shall be filled on the basis of plant seniority from among employees who have completed residency requirements to the job.

5. When it is necessary to fill permanent or temporary vacancies which are known to be 30 days or more in duration, management will take into consideration plant seniority and ability and when all the factors are relatively equal, then plant seniority will determine the promotion. Eligible employees will be given up to a thirty (30) day trial period.

6. Employees who do not pre bid temporary vacancies do not waive right to fill permanent vacancies.

7. Employees filling temporary vacancies shall be allowed to return to their former job when the temporary vacancy ends.

8. Posting and Bidding shall be for 3 work days. On pre bidding and the posting of permanent vacancies should an employee be absent any period of up to 42 work days, the Company and the

Union will work out an exception to cover his election.

9. The use of the word qualified is not intended to change the intent of the parties in the current Labor Agreement where seniority and ability are given consideration.

PRE–BID NOTICE

I _____ am interested in filling temporary vacancies of less than 30 days in the following job classifications.

_____

Clock No.____

Dated: _____

PROPOSED LINES OF PROGRESSION
BASTROP PLANT

Millwright
**Leadman
*Millwright
Electrician
*Truck Driver
*Truck Dispatcher

Miscellaneous
(Base rated job)

Palletizer Opr.
Asst. Palletizer Opr.
75 work days

Flamer Opr.
Auto Pack
Flamer Opr.
260 work days
Asst. Flamer Opr.
100 work days

Vulcanizer
Asst. Vulc.
130 work days
Ink Blender
50 work days

Conv. Opr.
Auto Stack
Asst. Conv.
Opr. Auto

Conv. Opr.
200 work days
Asst. Conv.
Opr.

Auto Stack
Stacker
Baler

Relief Packer
Towmotor Operator

Packer
Roll Towmotor Operator

Auto Pack
Packer
Material Handler

Inspector
Shipping Checker

Residency – Any combination of 150 work days as Asst. Conv. Opr. or Asst. Conv. Opr.-Auto shall satisfy residency for the purpose of promotion to Conv. Operator.

*Not in a Line of Progression
**Used when necessary

ORDER

For the foregoing reasons, IT IS ORDERED,

(1) That the United Paperworkers International Union and its Local 582 be held liable for back pay to the plaintiffs and the class they represent for the effects of the discriminatory practices, listed in the opinion of this date;

(2) That the amount of back pay ultimately determined to be due to each claimant be reduced by 50 per cent in consideration of the settlement between the Company and the class;

(3) That the defendant International Union and Local 582 prepare and send the notice, reply form and pre-addressed envelope as described in the opinion, to the class members, by registered mail, within twenty days of the service of this Order;

(4) That the International Union and Local 582 pay to the plaintiffs and the class they represent all their costs of this action, to be taxed by the Clerk of Court, including $9,912.50 as a reasonable attorney's fee; and

(5) That the effect of part (4) of this Order be suspended until a final judgment is rendered on the back pay issues and the cross-claims between the Company and the Unions.