Josef **EGGLESTON** and Albert Viera, Plaintiffs-Appellants,

v.

**CHICAGO JOURNEYMEN PLUMBERS' LOCAL UNION NO. 130, U. A., et al.,** Defendants-Appellees.

Edell **PLUMMER**, et al., Plaintiffs-Appellants,

v.

**CHICAGO JOURNEYMEN PLUMBERS' LOCAL UNION NO. 130, U. A., et al.,** Defendants-Appellees.

Nos. 80–1008, 80–1650.

United States Court of Appeals, Seventh Circuit.

Argued April 10, 1981.

Decided Aug. 11, 1981.

Rehearing and Rehearing In Banc Denied Oct. 7, 1981.

---

George F. Galland, Jr., Davis, Miner & Barnhill, Chicago, Ill., for plaintiffs-appellants.

Jerold S. Solovy, Howard R. Barron, Jenner & Block, Chicago, Ill., for Plumbing Contractors Ass'n.

Lawrence D. Ehrlich, Julian D. Schreiber, Borovsky, Ehrlich & Kronenberg, Chicago, Ill., for Journeyman Plumbers Local.

Leonard S. Goslawski, Paul V. Esposito, Lewis, Overbeck & Furman, Chicago, Ill., for Joint Apprenticeship Committee Local.

Before FAIRCHILD and WOOD, Circuit Judges, and HOFFMAN,* Senior District Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

This began as a not uncommon civil rights suit against a local union and a contractors association. It was brought by five named plaintiffs, seeking to represent a class of black and Hispanic persons alleging employment discrimination in their efforts to gain entry into the plumbing trade.[1] Controversy quickly erupted between attorneys over mutual discovery efforts which had been limited by the court to class certification issues. Although the complaint was filed in 1977 and was followed by voluminous interrogatories and in excess of 2,600 pages of deposition transcript, the case is before us now with the class issue still unresolved. The trial judge assessed all the fault against counsel for plaintiffs and dismissed the entire suit with prejudice. This appeal followed.

I.

A resolution of the controversy on the merits, the legitimate controversy between the litigants, not the lawyers, is nowhere in sight.[2] We regret that this court must review this type of dispute, because the conduct of this case reveals an abuse of the judicial processes which does a disservice not only to the court and litigants, but also to the public interest in the fair and efficient resolution of disputes.[3]

### Background

The five named plaintiffs are represented to be either black or Hispanic persons who had applied unsuccessfully for apprentice or journeyman membership in the Chicago Journeymen Plumbers' Local Union No. 130. Following those failures, each plaintiff allegedly filed charges with the Equal Employment Opportunity Commission ("EEOC"), and after exhausting that avenue retained counsel and filed suit against the three defendants.

---

* The Honorable Walter E. Hoffman, Senior District Judge of the Eastern District of Virginia, is sitting by designation.

1. The complaint alleges violations of both Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e et seq., and Section 1 of the Civil Rights Act, 42 U.S.C. § 1981. One minor issue concerning the propriety of the trial court's dismissal of plaintiffs' Title VII claim against one defendant will be addressed in Part II of this opinion, infra.

2. This dispute which festered between counsel, we trust, is an exception to their usual levels of professional competence.

3. Chief Justice Burger has often alluded to the "misuse and abuse of pretrial judicial process," and did so recently in his Annual Report on the State of the Judiciary delivered to the Mid-Year Meeting of the American Bar Association in Chicago, Illinois, on February 3, 1980. In his year-end Report on the Judiciary, December 29, 1980, the Chief Justice also highlighted the abuse by lawyers of the discovery process as contributing to the unnecessarily high costs of litigation.

For comments on the discovery controversy, see Julius B. Levine, "Abuse" of Discovery; or Hard Work Makes Good Law, 67 ABA Journal 565 (May 1981). See also Judge Milton Pollock, Discovery—Its Abuse and Correction, 80 F.R.D. 219 (1978); Judge William H. Becker, Modern Discovery: Promoting Efficient Use and Preventing Abuse of Discovery in the Roscoe Pound Tradition, 78 F.R.D. 267 (1978).

Plumbers' Local Union No. 130 ("Local 130") is alleged to be the labor organization representing all plumbers employed in Cook County, Illinois, and also certain plumbers employed outside the county. Plumbing Contractors Association of Chicago and Cook County ("Contractors Association" or "PCA") is alleged to represent most plumbing contractors within the jurisdiction of Local 130 and to be a co-signatory with Local 130 to a collective bargaining agreement which governs the terms and conditions of employment in the plumbing industry within Local 130's jurisdiction. It is further alleged that the Contractors Association, in consort with Local 130, controls the apprenticeship program operated by the Joint Apprenticeship Committee Local No. 130 U.A. ("JAC") which is alleged to be an unincorporated association that is an agent of and operates under the control of Local 130 and the Contractors Association in administering the apprenticeship program. The Committee is directed by a ten-person board, five members selected by the union and five by the Contractors Association.

Plaintiffs contend that substantially all plumbing work in the construction industry in the Chicago metropolitan area is performed under the labor agreement between Local 130 and the Contractors Association. Under the terms of that agreement there are two ways to enter into the plumbing trade and eventually become a "journeyman" plumber. One is to be admitted to the plumbers' apprenticeship program, and the other is to work for five years in the trade and then be recommended by a contractor. This latter procedure, however, first requires a permit from Local 130. At the conclusion of either procedure, the prospective journeyman must pass a test administered by Local 130.

Plaintiffs submit that the defendants have systematically denied admission into the apprentice program to blacks and Hispanics, and in the five-year program, the contractors association has refused to refer blacks and Hispanics to Local 130 to receive the permit necessary to gain the required qualifying experience. In addition to generally excluding blacks and Hispanics, plaintiffs aver that Local 130 has refused to administer the test for journeymen status to blacks and Hispanics and that the test, in any event, is discriminatory and non-valid. It is claimed that each of the named plaintiffs has been rebuffed from pursuing one or the other of the entry programs because of the alleged discrimination.

*Discovery Problems*

The trial court limited initial discovery to matters relevant to a determination of whether the suit should proceed as a class action.[4] Extensive interrogatories were exchanged, numbering into hundreds of questions and sub-questions. Things did not go smoothly from the outset. A series of motions to compel discovery were filed by each party. The trial judge labored patiently to resolve the questions during a period of months.[5] Next began the oral depositions of the named plaintiffs which lasted about sixteen days before the whole process collapsed. The plaintiffs claim that many questions were racially offensive; were intended to intimidate, harass and belittle plaintiffs; were argumentative, repetitious and obviously outside the knowledge of individual plaintiffs; and were not relevant to class certification issues.

Defendants seek to justify the questions propounded and fault the conduct of plaintiffs' counsel. They cite 965 refusals of the witnesses to answer. Defendants contend

4. *Plummer v. Chicago Journeyman Plumbers' Local No. 130, U. A.,* 77 F.R.D. 399 (N.D.Ill. 1977).

5. The plaintiffs raise as a separate issue what they label as the prejudicial partiality of the trial judge in presiding over all the continuing and bitter discovery wrangles. They claim there came a time when the judge should have recused himself. We summarily dispose of this issue. The bickering of the lawyers which constantly plagued the trial judge would have frustrated an angel. The lawyers have no one to blame except themselves. The trial judge carefully explained his decisions in reasoned memorandums. Whether we agree with all his decisions or not does not reflect adversely upon the impartiality of the trial judge.

that race was a proper subject for inquiry because plaintiffs' complaint made it an issue and failed to identify which plaintiffs were black and which Hispanic. Further, defendants argue that the complaint was confusing in that it did not make clear which plaintiffs were alleging racial discrimination and which were alleging national origin discrimination. Defendants additionally aver that plaintiffs failed to object in court to the alleged harassment or to seek protective orders. Defendants also complain that plaintiffs not only refused to answer numerous questions, but that plaintiffs' counsel declared that certain subject matter areas were off limits. Further, it is alleged that plaintiffs' counsel held at least 127 conferences off the record with their clients under circumstances which suggested "coaching" during the course of the deposition testimony. It is claimed that plaintiffs' counsel generally disregarded the Federal Rules of Civil Procedure and the orders of the court, all of which disrupted the discovery proceedings. Two of the plaintiffs, Eggleston and Viera, it is charged, unilaterally terminated their depositions and refused to appear to complete them. Defendants submit that plaintiffs' counsel did not give accurate information about the necessity of providing an interpreter for Viera. After hours of what is described as futile attempts at examination of Viera, an interpreter was engaged. Later during the deposition Viera became ill and did not complete the deposition. Plaintiffs claim that Viera "collapsed from exhaustion" because of defense counsel's grueling examination.

During his deposition, as an example, Eggleston refused to answer about 200 questions which defendants say were class related and propounded to determine his experience, skill and qualifications to work as a journeyman plumber. Plaintiffs say, however, that the questions were only technical plumbing questions unrelated to class issues and therefore walked out of the deposition offering to return when only class related questions would be asked. Plaintiffs' counsel made it plain that he was not going to submit his clients for opposing counsel's "plumbing test," since opposing counsel himself "had flunked the legal test so far in this lawsuit," and that plaintiffs' counsel was not prepared "to make him the judge in any plumbing test...." We see no need to set down for posterity all the details of the deposition squabbling. We hope that what has already been briefly mentioned, together with some additional details, will be sufficient to paint the picture for our purposes. As a result, the district court dismissed the claims of Eggleston and Viera and entered a rule to show cause why the three remaining plaintiffs should not also have been dismissed. Five months later, after discovery remained bogged down, the court dismissed the claims of the remaining plaintiffs with prejudice.

### Class Action and Discovery Overview

Class actions are governed by Fed.R. Civ.P. 23.[6] Plaintiffs seek to bring their

---

**6.** In pertinent part, Rule 23 provides:

(a) *Prerequisites to a Class Action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) *Class Actions Maintainable.* An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding

class action under Rule 23(a) and (b)(2). Allegations of discrimination do not constitute a by-pass around Rule 23, as the Supreme Court made clear in *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 405–06, 97 S.Ct. 1891, 1897–98, 52 L.Ed.2d 453 (1977):

> We are not unaware that suits alleging racial or ethnic discrimination are often by their very nature class suits, involving classwide wrongs. Common questions of law or fact are typically present. But careful attention to the requirements of Fed.Rule Civ.Proc. 23 remains nonetheless indispensable. The mere fact that a complaint alleges racial or ethnic discrimination does not in itself ensure that the party who has brought the lawsuit will be an adequate representative of those who may have been the real victims of that discrimination.[7]

Accordingly, some degree of discovery may be appropriate in certain cases to aid making the necessary class determinations. The pleadings are expected to be of assistance, but more information may be needed. *Doctor v. Seaboard Coast Line R. Co.*, 540 F.2d 699, 707 (4th Cir. 1976). However, "nothing in either the language or history of Rule 23 ... gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974).

The trial court in the present case specifically limited discovery to class determination issues. The boundary between a class determination and the merits may not always be easily discernible. *Eisen* has not been interpreted so broadly, however, as to foreclose inquiry into whether plaintiff is asserting a claim which, assuming its merit, will satisfy the requirements of Rule 23 as distinguished from an inquiry into the merits of plaintiff's particular individual claim. *Doctor v. Seaboard Coast Line R. Co.*, *supra*, 540 F.2d at 707. Some overlap may be unavoidable.[8] The burden of establishing class requirements rests on plaintiff, *Carracter v. Morgan*, 491 F.2d 458, 459 (4th Cir. 1973), but it is often the defendant, preferring not to be successfully sued by anyone, who supposedly undertakes to assist the court in determining whether a putative class should be certified. When it comes, for instance, to determining whether "the representative parties will fairly and adequately protect the interests of the class," or the plaintiffs' ability to finance the litigation, it is a bit like permitting a fox, although with a pious countenance, to take charge of the chicken house.

Under Rule 23(a) the focus of the class determination inquiry should be on certain criteria. First is numerosity. It ordinarily is not difficult to ascertain if a class approach would be useful to avoid the practical problems of trying to join many named plaintiffs or otherwise clog the docket with numerous individual suits. Except for the class approach many might never receive any redress for the wrong done them. Second is commonality. Ordinarily it is not difficult to determine if there appear to be common questions of law or fact. In a discrimination suit this requirement may be

---

declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions: (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

7. See Comment, *The Class Action and Title VII—an Overview*, 10 U. Richmond L.Rev. 325 (1976).

8. See Rita J. Edwards, *Hearing on Maintainability of a Class Action Suit Should Not Determine Ultimate Merits of Individual Claim*, 11 Houston L.Rev. 732 (1974).

satisfied even though there may be differences in the details of individual claims. The third is typicality. The rule requires that the claims or defenses of the named parties be typical of the claims or defenses of the class. This simply requires a showing, not unrelated to commonality, that others suffer from similar alleged grievances. Nor is this ordinarily a difficult preliminary showing to make in many discrimination cases.

Finally is the requirement that the named parties will fairly and adequately protect the interests of the class members who are not personally involved in the litigation. This requirement is often more difficult to resolve. Whenever certain named persons purport to represent others without their knowledge or consent, the court must be assured that the named parties are qualified and capable of fully pursuing the common goals of the class without collusion or conflicts of interests. That requires competent and experienced counsel able to conduct the litigation. Even so, the class representative's role is limited. It was found not to be enough to defeat a class certification in *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 366, 86 S.Ct. 845, 847, 15 L.Ed.2d 807 (1966), that the named plaintiff did not understand her complaint at all, could not explain the statements in it, had little knowledge of what the lawsuit was about, did not know the defendants by name, nor even the nature of the misconduct of the defendants. The plaintiff, a Polish immigrant, had relied on her son-in-law. *Surowitz* appears to be an extreme case, but it does illustrate the flexibility and broad area for the exercise of the trial court's common sense and good judgment in particular instances.[9]

In addition, provided those criteria are met, there remains one of several other criterion under Rule 23(b) to be satisfied. In the present case plaintiffs allege under (b)(2) that the defendants have acted or refused to act on discriminatory grounds generally applicable to the class rendering final injunctive or declaratory relief appropriate. The invocation by plaintiffs of (b)(2) in the circumstances alleged is not novel, since it appears to have been drafted primarily for racial discrimination cases.[10]

■ Often it is more difficult to apply those rules to a given situation than their text initially suggests, but with the good faith assistance of the parties, a court should be able "as soon as practicable after the commencement of an action brought as a class action" to make the necessary and appropriate initial determination under Rule 23. After all, a favorable class determination by the court is not cast in stone. If the certification of the class is later deemed to be improvident, the court may decertify, *Sayre v. Abraham Lincoln Federal Savings & Loan Ass'n*, 65 F.R.D. 379, 384 (E.D.Pa.1974); subclassify, *Wolfson v. Solomon*, 54 F.R.D. 584, 592 (S.D.N.Y.1972), alter the certification, *Hernandez v. United Fire Insurance Co.*, 79 F.R.D. 419, 433 (N.D. Ill.1978), or permit intervention, *United States v. Trucking Employers, Inc.*, 72 F.R.D. 101, 106 (D.D.C.1976). If, as distinguished from the ideal, the class certification inquiry is twisted and misused so as to impede, harass, discourage or to accomplish some other perceived tactical advantage, then the court's firm hand is necessary. In this case the trial court found a willful failure to make discovery and applied the most severe sanction, dismissal of plaintiffs' cause of action with prejudice under Fed.R. Civ.P. 37.

*The Degeneration of Class Issue Discovery*

It is necessary to remember that the issue being addressed during discovery was only whether or not this case, brought by three allegedly black and two Hispanic persons, should proceed as a class action upon the

---

9. Recently the Supreme Court in *Deposit Guaranty National Bank v. Roper*, 445 U.S. 326, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980), and *United States Parole Commission v. Geraghty*, 445 U.S. 388, 99 S.Ct. 1420, 59 L.Ed.2d 632 (1980), illustrated in a different context that the fate of the named plaintiff does not always control what happens to the class.

10. *See* Advisory Committee Notes on Rule 23, Fed.R.Civ.P.

allegation that they and others similarly situated had been systematically excluded from the plumbing trade in Cook County because of their race or national origin.

Discovery began with two sets of interrogatories numbering over 200 inquiries submitted to plaintiffs. These interrogatories touched on the employment history of plaintiffs, educational background, efforts to gain entry into the trade and the definition and size of the class plaintiffs sought to represent. Serious trouble erupted later when defendants sought to depose the named plaintiffs. We shall sample only a portion of defendants' interrogatories which were claimed by plaintiffs to have been objectionable.[11]

It is asserted that plaintiff Eggleston over about a two and one-half day period was asked racially offensive questions and as a result was instructed by his counsel not to answer certain of those questions.[12] It is

11. We acknowledge the assistance given by the brief of the Equal Employment Opportunity Commission as *amicus curiae*, and likewise by the briefs of Chicago Lawyers Committee for Civil Rights under Law, Inc., as *amicus curiae*.

12. In order to fully appreciate the general nature and tone of the race interrogation of Mr. Eggleston, it is necessary, unfortunately, to set forth lengthy selected portions of the transcript:

\* \* \* \* \* \*

Q  Where was your father born, Mr. Eggleston?
A  Mississippi.
Q  Do you know where in Mississippi your father was born?
A  No.
Q  Is your father a person of Spanish origin?
A  No.
Q  Is your father a member of the Negro race?
A  Yes.
Q  And on what do you base that answer, Mr. Eggleston?
A  What you said, the Negro race.
Q  Have you ever discussed this case with your father?
A  No.
Q  What is your mother's name, Mr. Eggleston?
A  Willie Anne Eggleston.
Q  Is she living, sir?
A  Yes.
Q  What is her address?
A  1408 Cherry Street.
Q  When did you last see your mother?
A  I saw her the 4th of July, this year.
Q  What is your mother's maiden name?
A  Jones.
Q  She was born Willie Anne Jones?
A  I don't know whether she was born as Willie Anne Jones, but—
Q  That is her name as you know it?
A  Yes.
Q  Have you ever discussed this case with her?
A  No.
Q  Where was your mother born?
A  Mississippi.
Q  Do you know in what city or town in Mississippi?
A  No.
Q  Is your mother a person of Spanish origin?
A  No.
Q  Do you contend that your mother is a member of the Negro race?
A  Yes.
Q  And what is the basis of your belief, Mr. Eggleston?
A  What has been introduced to me in the educational system of the United States.
Q  What is your birth date, Mr. Eggleston?
A  7/17/39.
Q  July 17, 1939?
A  Correct.
Q  Are you a member of the Negro race?
A  Yes.
Q  Is any ancestor of yours Caucasian?
A  I rather not answer.
Q  I think it is a proper question. I believe you should answer the question, Mr. Eggleston.
MR. MINER: If you know. If you have first-hand knowledge.
BY THE WITNESS: A  I can only go by what my grandmother tells me, you know. I don't know if it is true or not.
BY MR. BARRON: Q  What did your grandmother tell you, sir?
A  Well, she said our—she said yes.
Q  That some of your ancestors were Caucasian?
A  Yes.
Q  And is this your mother's mother or your father's mother who told you that?
A  My father's mother.
Q  Is she still living?
A  Yes.
Q  What is her name?
A  Berta Eggleston. Berta or Bertie.
Q  Would you tell us what she said to you about your ancestors?
MR. MINER: Listen. I am going to cut this off right now, and I will just instruct him not to answer any further questions. If you want to raise some doubt as to whether or not Mr. Eggleston is a black man, Howard, you are free to do so; but you have established that both his

represented to us by plaintiffs that Mr. Eggleston at least appears to qualify as a black.[13] To inquire, for instance, into what Eggleston's grandmother told him about any caucasian ancestors he may have had is a totally unjustified and reprehensible intrusion into personal family history. Defendants claim a license to fully explore race because the complaint was vague and failed to inform defendants which specific plaintiffs claimed to be black or Hispanic, and whether the charge was based on alleged racial or color discrimination or on

basis of national origin. However, we find that defendants offer little justification for the nature and the extent of their interrogation of Eggleston. Defendants, however, claim that similar discovery yielded significant racial information about plaintiffs Rose, Taylor and Viera. We shall briefly examine each.

Defendants point out that Rose testified that he was not Spanish-surnamed and that he considered his race to be mulatto,[14] that Taylor testified that his race was mestizo,[15] and that Viera testified he was white al-

mother and father are members of the Negro race, and whether some hundred years ago he had some white blood introduced into his system is, I think, irrelevant, and I will instruct him not to answer any more questions.

BY MR. BARRON: Q Would you answer the question, please, Mr. Eggleston?

MR. MINER: I have instructed him not to answer.

You can tell him that you are not going to answer the questions when I instruct you not to.

BY THE WITNESS: A I rather not answer.

BY MR. BARRON: Q What is your grandfather's name, Mr. Eggleston?

A Josef Eggleston.

Q Do you know your great grandfather, Mr. Eggleston, on your father's side?

MR. MINER: Listen, Howard. This is getting bizarre. I am going to instruct him not to answer any more questions about anything beyond his grandparents just so that we might finish this in less than the time it took us to get through Mr. Plummer's deposition.

MR. BARRON: We are not through with Mr. Plummer's deposition, Mr. Miner.

MR. MINER: I am well aware of that.

BY MR. BARRON: Q Would you answer the question, please, Mr. Eggleston?

\* \* \* \* \* \*

Q How can you tell if a person is a Negro?

A Because he is different, you know. One, he would—I can describe it to the best of my knowledge.

Q Okay.

A Okay. He is of color, African descent, and, well, I will just let it be at that.

Q Okay. I am asking for your beliefs now, and it is somewhat of an indelicate topic which was raised earlier today.

Can a person who has—who is part black, Negro, and part white be considered to be a black person, a Negro person?

A That depends on how the—I would say the society views him.

Q And that is based primarily on what?

A It is based primarily upon the opinions of the society.

\* \* \* \* \* \*

Q Do you contend that there are persons who would be described as being Negro who have some Caucasian ancestors?

A Yes.

Q Do you contend that there are people who would be described as being Caucasian who have some Negro ancestors?

A It's possible.

Q Can you tell me what the difference is between a Negro with some Caucasian ancestors and a Caucasian with some Negro ancestors?

A There would be no difference if you don't classify them already, you know.

Q Besides Negroes, who are included in the class that you purport to represent?

A Hispanos or Hispanic.

Q What is an Hispanic?

A One of Spanish origin.

Q By that, you mean one who is born in Spain?

A Not necessarily.

Q Is it a person whose ancestors were born in Spain?

A Well, yes, you could say ancestors.

Q I want to know what you say. Is it a person whose ancestors were born in Spain?

A Yes.

Q Can you tell I am a person of Spanish origin?

A No.

Q So, insofar as you know, I may be a person of Spanish origin, is that correct?

A Right.

\* \* \* \* \* \*

13. Mr. Eggleston's counsel in his brief describes his client "as black as coal," and it is not disputed.

14. Mullatto is generally defined as a person with mixed Negro and Caucasian ancestry.

15. Mestizo is generally defined as a person of mixed parentage sometimes meaning the offspring of a Spaniard or Portuguese and an American Indian.

though on his discrimination charges filed with the EEOC he indicated he had suffered racial as well as national origin discrimination. Why it is significant that Rose does not have a Spanish surname escapes us. He testified that both his father and mother were black. When asked upon what he based his knowledge that his father was black, Rose explained because "he has the same type of hair that I do." When asked about the basis of his belief that his mother was black, he declined to elaborate. Taylor testified that he was born in Cuba and came to this country in 1972 "by a political problem." He did testify that he considered his race to be "mestizo," and explained that he considered himself to be part Hispanic, not Negro. Taylor's mother was also born in Cuba and was considered by him to be of Spanish origin. He attempted by way of background to explain that people of Spanish origin were the first to come to the New World and mingled with the natives and others resulting in race combinations which he referred to as mestizo. Viera testified that he was white, but that answer came in response to a question inquiring if he were black. He further testified that he had fled from Cuba in 1972, that his father was Cuban. Ironically, defendants complain of the lack of an interpreter to help them in questioning Viera because he was fluent only in Spanish.

In our view some limited exploration of race was appropriate, but what we have witnessed in this case is an objectionable effort by defendants to administer some sort of verbal blood test to each defendant. This is not a paternity suit. It should have been an effort to assist the court in determining whether or not plaintiffs qualified as class representatives in a suit charging that certain minorities were being excluded from the plumbing trade. For the purposes of this case, we do not need a legal laboratory to analyze blood samples drawn from the plaintiffs in order to type them into possible subclasses or for any other reason. It should not be so difficult and disagreeable to determine if plaintiffs are black enough or Hispanic enough to satisfy any reasonable criteria in order to qualify to represent others in class composed of ordinary blacks and Hispanics.

Apart from the racial probing, other avenues of defendants' inquiry deserve examination. Although the deposition was not scheduled as a bar examination, Eggleston and Rose were asked questions some members of the bar might have difficulty answering.[16]

Religion also got some attention. Eggleston was asked if he purported to represent Jews as well as Buddhists. We find no issue of religion in the case.

Even though the deposition was not an examination to determine if Eggleston should be issued a plumber's license by the State of Illinois, some of the questions suggest otherwise.[17]

Some of the defendants' questions demonstrate a stubborn tendency to insist on valueless answers.[18]

---

**16.** For example, Eggleston was asked if he had ever heard of Rule 23 and what the requirements of a class action were. Rose was asked, for instance, if he knew whether Local 130 was "engaged in an industry affecting commerce" or if he knew whether Local 130 was "a labor organization within the meaning of 42 U.S.C. § 2000-D." Rose was asked if he knew what subclasses were and if he thought there should be subclasses in this case.

**17.** For example, Eggleston was asked about fabricating piping systems, principles of corrosion, cross connections, glove valves, check valves, etc.

**18.** An example from the interrogation of Rose:
 \*   \*   \*   \*   \*   \*

Q When you discussed with Mr. Miner [one of plaintiffs' counsel] the facts known to him which gave rise to your allegations in this complaint, were you and Mr. Miner alone?
  A Yes.
Q When you talked to him on the telephone, were there any other persons who were in on that telephone conversation?
  A Unless Mr. Miner has a party line, the answer would be no.
Q Is your answer then that you don't know?
  A I said unless Mr. Miner has a party line, the answer is no.
Q Does Mr. Miner have a party line?
  A You would have to ask Mr. Miner.
Q Do you know whether Mr. Miner has a party line?

Some of the defendants' questions were argumentative and senseless.[19]

Some questions were repetitious,[20] or worse.

Other questions sought to test what one plaintiff knew concerning a co-plaintiff's knowledge about the merits of the case.[21]

Defendants defend their extensive explorations, but our examination of their excesses, some of which we have briefly sampled herein, satisfies us that they were more interested in tactics than answers. Defendants did not move to compel answers to many of their more inappropriate questions, so the significance of the omitted questions was not highlighted to the trial judge. After Viera and Eggleston were dismissed, the defendants moved to compel the remaining plaintiffs to answer approximately 408 of the 965 deposition questions

A You would have to ask Mr. Miner. I don't pay his telephone bill. I don't know his installations.

Q Do you know whether Mr. Miner has a party line?

A I do not know whether Mr. Miner has a party line.

19. An example from the Rose deposition will suffice. Reference was made to an exhibit in which a sentence stated that a class action was the best method for the fair and efficient adjudication of the controversy. Rose was asked what the allegation was based on. Rose first answered that it would eliminate racial discrimination. Several questions later that particular sentence was still the object of the interrogation:

\*   \*   \*   \*   \*   \*

Q How would that sentence eliminate racial discrimination?

A It's the best available method for fair and effective adjudication of the controversy, quote.

Q Is that how that sentence would eliminate racial discrimination?

A Partially.

Q How else would it eliminate racial discrimination?

A By doing what's just.

Q How would it do what is just?

A By dropping the racial barriers.

Q How would that sentence do that?

A I have answered to the best of my knowledge.

Q I don't believe you have answered that question, Mr. Rose.

A As far as Hispanic and black, I have answered it to the best of my knowledge.

Q Would that sentence eliminate discrimination on the basis of sex?

\*   \*   \*   \*   \*   \*

Two more pages (six questions) later the matter had not yet been concluded:

Q What is your basis for your allegation that a class action is the best available method for the fair and efficient adjudication of the controversy?

MS. ANDERSON: I am going to object. I think that question has just been answered, and he answered it to the best of his ability. Now, I don't see why we have to keep going over and over this for five dozen times.

BY MR. MANDEL: Q Mr. Rose, will you answer the question?

A I have answered it to the best of my knowledge. I told you this previously. Now, if you want to badger, go ahead.

Q What is the basis for your belief that class action is the best available method for fair and efficient adjudication of the controversy?

MS. ANDERSON: I am going to instruct him not to answer since he has answered the question to the best of his ability, and he has so stated on the record.

\*   \*   \*   \*   \*   \*

20. A concise example from the Eggleston deposition will suffice. Eggleston was asked if he knew who the defendants in the case were. Plaintiffs' counsel objected that the question had been asked and answered just the day before. Defendants' counsel then responded:

\*   \*   \*   \*   \*   \*

MR. MANDEL: I'm asking Mr. Eggleston if he *knows today* who the defendants in this case are [emphasis added].

\*   \*   \*   \*   \*   \*

21. Paragraph 12C of plaintiffs' amended complaint alleged that Local 130 had refused to issue licenses or permits to blacks or Hispanics who sought employment as plumbers. A series of questions propounded to Eggleston about not only paragraph 12C but also other paragraphs of the complaint sought to find out what he knew about his co-plaintiffs' claims.

\*   \*   \*   \*   \*   \*

Q. Upon what facts do the other plaintiffs in this case base their allegations in Paragraph 12C?

\*   \*   \*   \*   \*   \*

Q. Do you know of any of the other facts upon which the other plaintiffs in this case base their allegations in Paragraph 12C?

\*   \*   \*   \*   \*   \*

Q. How do you know the allegations in Paragraph 12C are based on facts known to the other plaintiffs?

\*   \*   \*   \*   \*   \*

Q. What facts known to other persons is it [Paragraph 12C] based on?

\*   \*   \*   \*   \*   \*

which had not been answered. That left approximately 551 unanswered questions to which defendants did not seek to compel answers. If, however, those unanswered questions were not worth pursuing, they were not relevant or worth asking in the first place. The stack of depositions examined by this court exceeds a foot in height and this is supposed to represent discovery solely on the class issue. It is an example of "runaway" discovery which is excessive, burdensome, unnecessary and intrusive. The attack by deposition appears to have been designed for some other purpose than to assist the court in making a class determination. We see no justification for a verbal third degree to resolve the class issue.

The fault, however, is not all one sided by any means. Plaintiffs' counsel must share in the responsibility for this deposition mess. It is difficult to tell which side can be said to have actually started the trouble. In this chicken or egg situation, we have decided to concentrate on the deposition questions as the principal basis for our view

of the affair, but that does not mean that we minimize the conduct of plaintiffs' counsel. There were 965 refusals to answer by plaintiffs with only a limited number of those refusals being related to the excesses we have considered. The wholesale practice of plaintiffs in refusing to answer many questions which were unrelated to a claim of privilege, *Ralston Purina Co. v. McFarland*, 550 F.2d 967, 973 (4th Cir.1977), or without taking the initiative of seeking relief from the court in advance under either Rule 26(c), Fed.R.Civ.P.,[22] or during the course of the interrogation under Rule 30(d), Fed.R.Civ.P.,[23] contributed significantly to the disarray. Plaintiffs counter that if defendants desired an answer to their questions, it was their responsibility to move under Rule 37(a) for an order compelling discovery. Defendants utilized that remedy to some extent. Plaintiffs also note that defendants (on rare occasions) also instructed their witness not to answer during depositions. There were also an estimated 127 private, off-the-record conferences between plaintiffs and their counsel, many of

22. Rule 26(c) provides:

(c) *Protective Orders.* Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court in which the action is pending or alternatively, on matters relating to a deposition, the court in the district where the deposition is to be taken may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (1) that the discovery not be had; (2) that the discovery may be had only on specified terms and conditions, including a designation of the time or place; (3) that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery; (4) that certain matters not be inquired into, or that the scope of the discovery be limited to certain matters; (5) *that discovery be conducted with no one present except persons designated by the court;* (6) that a deposition after being sealed be opened only by order of the court; (7) that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way; (8) that the parties simultaneously file specified documents or information enclosed in sealed envelopes to be opened as directed by the court.

If the motion for a protective order is denied in whole or in part, the court may, on such terms and conditions as are just, order that any party or person provide or permit discovery. The provisions of Rule 37(a)(4) apply to the award of expenses incurred in relation to the motion.

23. Rule 30(d) provides:

(d) *Motion to Terminate or Limit Examination.* At any time during the taking of the deposition, on motion of a party or of the deponent and upon a showing that the examination is being conducted in bad faith or in such manner as unreasonably to annoy, embarrass, or oppress the deponent or party, the court in which the action is pending or the court in the district where the deposition is being taken may order the officer conducting the examination to cease forthwith from taking the deposition, or may limit the scope and manner of the taking of the deposition as provided in Rule 26(c). If the order made terminates the examination, it shall be resumed thereafter only upon the order of the court in which the action is pending. Upon demand of the objecting party or deponent, the taking of the deposition shall be suspended for the time necessary to make a motion for an order. The provisions of Rule 37(a)(4) apply to the award of expenses incurred in relation to the motion.

which occurred between the question and answer or the declination to answer. It is too late once the ball has been snapped for the coach to send in a different play. Sometimes plaintiffs' counsel would interrupt their client's answer and instruct that enough had been said. Other answers were evasive. The parties appeared before the trial judge on five occasions to report on the progress of class discovery, but plaintiffs' counsel did not move for a protective order or complain about the racial harassment now claimed on appeal. There were numerous unprofessional exchanges between counsel more suggestive of an argument in an alley than a professional undertaking. A large share of those exchanges appear to have been provoked by plaintiffs' counsel.

Other obstructive tactics were used. The depositions of Viera and Eggleston were aborted unilaterally by plaintiffs, and never completed, although plaintiffs seek to justify those actions. The trial court's warnings were not heeded. Plaintiffs' counsel evidenced little willingness to help resolve the impasse. Instead counsel charged the trial judge with bias.

Having tried to control this situation, the trial judge dismissed Eggleston and Viera for failure to appear to complete their depositions and subsequently dismissed the claims of the remaining three plaintiffs with prejudice for their "evasive and thwarting conduct." Even though we find a reversal to be necessary, we do not fault the efforts of the trial judge. Nor do we endeavor to assign fault to one side or the other, as there is more than enough fault for counsel on both sides to share.

### Deposition Procedures

■ Plaintiffs' wholesale refusals to answer questions, whether the questions were arguably relevant or not, raises deposition procedural questions deserving of brief examination. Some courts view an attorney's direction that a question not be answered (except if privileged) as highly improper, as the answer should be given subject to objection, or the matter raised pursuant to Rule 30(d). *Ralston Purina Co. v. McFarland, supra*, 550 F.2d at 973–74. In the Northern District of Illinois where the present case arose, and to some extent in reliance upon it, it is announced in *Coates v. Johnson and Johnson*, 85 F.R.D. 731, 733 (N.D.Ill.1980), that "the general rule in this district is that absent a claim of privilege, it is improper for counsel at a deposition to instruct a client not to answer. If counsel objects to a question, he should state his objection for the record and then allow the question to be answered." Wright & Miller, *Federal Practice and Procedure*: Civil § 2113, at 419 n.22 (1970), is also relied upon as it suggests that the better practice is to take the evidence subject to objection. It is noted in *Coates, supra*, 85 F.R.D. at 733, that in *Shapiro v. Freeman*, 38 F.R.D. 308 (S.D.N.Y.1965), it was indicated that "[i]t is not the prerogative of counsel, but of the court to rule on objections." Moore, however, states that when either privileged or irrelevant information is sought "the only course is to decline to answer." 4A Moore's *Federal Practice*, 37.02[2] (1981). Plaintiffs, in support of their refusal to answer without seeking court guidance, have supplied numerous affidavits of area attorneys who follow that same practice. Plaintiffs also point to Judge Robson's prior decision in *In re Folding Carton Antitrust Litigation*, 83 F.R.D. 132 (N.D.Ill.1979), as condoning the practice which they followed.

■ The district court has wide discretion within the rules to determine the manner and course of discovery. *Burns v. Thiokol Chemical Corp.*, 483 F.2d 300, 307 (5th Cir. 1973). We do not propose by this case to impose any particular practice on the district courts. No due process or similar objection has been raised. It does appear that some counsel may not be aware of the local procedures. Confusion about the approved practice may have contributed somewhat to the problems, but does not excuse them in this case.

■ We believe it would be difficult to fashion a hard and fast rule to apply to all situations which did not at times have impractical side effects. Depositions cannot

be taken in the judge's reception room so that the judge always will be readily available to either counsel. Rule 26(b)(1), Fed.R. Civ.P., limits discovery to matters which are not privileged, but it also requires that the matters be "relevant." "Relevant" is defined in Rule 401, Federal Rules of Evidence,[24] but relevancy in the context of a discovery deposition has a broader meaning. Admissibility at trial is not the test. Evidence is relevant in a discovery context if it is relevant to the subject matter of the litigation as Rule 26(b)(1) states, not just the particular issues presented in the pleadings. A more liberal interpretation is allowed, *Duplan Corp. v. Deering Milliken, Inc.*, 397 F.Supp. 1146, 1187 (D.S.C.1974) (and the cases cited therein), and "flexible treatment" is required, *Sylgab Steel & Wire Corp. v. Imoco-Gateway Corp.*, 357 F.Supp. 659, 661 (N.D.Ill.1973). There is no requirement that every relevant question, as broadly interpreted, which counsel can conjure up must be asked. Only what is reasonably necessary for the particular purpose, in this case class certification, is appropriate.

With a liberal interpretation of relevance comes the risk of abuse and good faith differences of opinion. It is accepted that a question calling for privileged matter need not be answered. To answer subject to an objection of privilege could destroy the privilege. Relevancy, although mentioned in the rule along with privilege, does not necessarily deserve the same respect.

Rule 30(c), Fed.R.Civ.P., says the evidence should be taken subject to the objection. Some questions of doubtful relevancy may be innocuous and nothing is lost in answering, subject to objection, except time. That is the general rule. Other irrelevant questions, however, may unnecessarily touch sensitive areas or go beyond rea-

sonable limits as did some of the race questions propounded to Eggleston. In such an event, refusing to answer may be justified. *In re Folding Cartons* does not condone wholesale refusals, but displays thoughtful flexibility in limited instances. There is no more need for a deponent to seek a protective order for every question when a dispute arises than there is a need to seek to compel an answer for each unanswered question. If a particular question is important or opens up a whole area of questionable relevance, or other serious problems develop which counsel cannot solve themselves, then resorting to the court may be justified or necessary.

█ Each side has available remedies. Rule 30(d) protects a deponent from bad faith questioning, or questioning in such a manner as may unreasonably annoy, embarrass, or oppress. There may be times when that rule also deserves a liberal interpretation to curb abuse. On the other hand, Fed.R.Civ.P. 37 provides for compelling a response. Counsel should be able to resolve many of the controversies themselves leaving to the court only those important matters otherwise unresolvable. It may be more practical in some situations to accumulate the unresolved problems so as not to be constantly interrupting a deposition to run to an overworked judge. If it appears that there is a significant disagreement about discovery, it may also be worthwhile to seek a discovery conference under new Rule 26(f). That is permitted at any time after commencement of the suit upon certain conditions. The discovery conference should make the applicable rules clear. If the exercise of common sense and good professional judgment by counsel in a reasonable and flexible manner fail to solve the problem, then remedies are available, and sanctions, too.[25] Each counsel has the

---

24. Rule 401 provides:

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

25. *See* Note, *Recent Trends in the Enforcement of Discovery: Sanctions in the Federal Courts and in Illinois*, 11 Loyola U.L.J. 773 (1980). For a current discussion of discovery abuse and the use of sanctions in complex litigation, *see* American College of Trial Lawyers Recommendations on Major Issues Affecting Complex Litigations, pp. 5–19 (Feb. 27, 1981). Much of the

responsibility to attempt to resolve conflicts. Different situations may require different steps to be taken. When the court's aid is sought the matter must be fairly and fully presented. In the present case, plaintiffs' counsel complains here of problems neither fully nor timely brought to the trial court's attention.

■ Ordinarily, we would condone the use of appropriate sanctions when attorneys forsake their professional responsibilities, but in this discrimination case the sanctions fall too heavily upon the individual plaintiffs who were not knowledgeable in the ways of the law, as well as on the other putative members of the class they seek to assist. Members of the putative class, knowing of this present ordeal, could not but be discouraged from instituting similar individual undertakings against these defendants. If there is any merit to the charges of discrimination against minorities by those who control the plumbing trade in the Chicago area, then, too, the dismissal sanction rests too heavily upon the public.

We believe that Senior Judge Robson should be relieved of the burden of this vexatious case by the application of Circuit Rule 18 on remand as the case is still in its initial stages. Discovery on the merits may still lie ahead if a class is certified.

It is not for us to decide whether the class issue has been sufficiently explored to permit its determination. We leave that for the trial court. The volumes of discovery suggest that enough is enough, but it may be found that some additional discovery reasonably may be needed in certain clearly defined areas. If so, it should be expeditiously accomplished.

The Supreme Court in *Hickman v. Taylor*, 329 U.S. 495, 507, 67 S.Ct. 385, 91 L.Ed. 451 (1947), acknowledged that "[N]o longer can the time-honored cry of 'fishing expedition' serve to preclude a party from inquiring into the facts underlying his opponent's

discussion there need not be restricted to complex litigation.

**26.** *Omnium Lyonnais D'Etancheite et Revetement Asphalte v. Dow Chemical Co.*, 73 F.R.D.

case," but the Court also stated that discovery "has ultimate and necessary boundaries." In a simple discrimination case such as this one, where the only current discovery issue relates to class certification, although concededly an important issue, the "fishing license" nevertheless need ordinarily be only a limited one with an early expiration date. "It is well established that discovery has limits and that these limits grow more formidable as the showing of need decreases." *United Air Lines, Inc. v. United States*, 26 F.R.D. 213, 219 n.9 (D.Del. 1960).

In order to complete discovery upon the class issue or later upon the merits of the Title VII or § 1981 claims themselves, the trial court may find it useful in this case in view of the exceptional circumstances created by the past performances of counsel to consider the appointment of a master pursuant to Rule 53, Federal Rules of Civil Procedure.[26] We recommend this course, as an on the spot "referee" may be needed to expedite further discovery. The costs of using this procedure will fall upon the parties and possibly serve as a deterrent to further abuse. The designation of a magistrate pursuant to 28 U.S.C. § 636(b) while also viable, is a less satisfactory alternative as magistrates have numerous other duties besides refereeing where no referee should ordinarily be needed.

In the circumstances of this case we are lifting the particular sanctions applied to plaintiffs because the general deterioration cannot be attributed solely to plaintiffs. Under the circumstances, we consider it an abuse of discretion to have tried to cure abuse on both sides by denying plaintiffs all opportunity for relief. No hint of further discovery abuse by any party in this case should be tolerated.

## II.

Plaintiffs also allege that the trial court erred in dismissing their Title VII claim

114, 117–18 (C.D.Cal.1977); *Fisher v. Harris, Upham & Co., Inc.*, 61 F.R.D. 447, 449 (S.D.N.Y.1973), *appeal dismissed*, 516 F.2d 896 (2d Cir. 1975).

against defendant the JAC. We agree and therefore reverse the JAC's dismissal.

On October 28, 1975, plaintiff Rose filed a timely EEOC charge alleging that Plumbers' Local 130 had refused to hire him as an apprentice or journeyman plumber.[27] On March 9, 1977, Rose filed an amended EEOC charge, naming PCA, Local 130, the International Union, and the JAC.[28]

The district court, in response to a motion by the JAC, dismissed plaintiffs' Title VII claim against the JAC, *Plummer v. Chicago Journeyman Plumbers' Local Union 130, U.A.*, 452 F.Supp. 1127, 1132–36 (N.D.Ill. 1978). In so doing, the court ruled that Rose's original charge did not properly name the JAC; that the amended charge was untimely as it was filed more than 180 days subsequent to Rose's last EEOC application; and that the JAC was not an agent of Local 130 and the PCA and thus could not be sued in such a capacity.[29]

■ The JAC argues that the dismissal of the Title VII claim was proper because plaintiff Rose failed to name the JAC in his initial charges filed with the EEOC. Title VII provides that if after timely filing of a discrimination charge, the EEOC is unable to obtain compliance with the Act's provisions, "a civil action may be brought against the respondent named in the charge" by the person claiming to be aggrieved. 42 U.S.C. § 2000e–5(f)(1). Accordingly, it is well settled that ordinarily a party not named in an EEOC charge may not be sued under Title VII. *Le Beau v. Libbey-Owens-Ford Co.*, 484 F.2d 798, 799 (7th Cir. 1973) (Clark, J.); *Williamson v. Bethlehem Steel Corp.*, 488 F.Supp. 827, 835 (W.D.N.Y.1980). This requirement is said

to be jurisdictional, *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), the reason being that the charge serves to notify the charged party of the alleged violation and also brings the party before the EEOC, making possible effectuation of the Act's primary goal of securing voluntary compliance with its mandates. *Bowe v. Colgate-Palmolive Co.*, 416 F.2d 711, 719 (7th Cir. 1969). *See Williams v. General Foods Corp.*, 492 F.2d 399, 404 (7th Cir. 1974).

■ With the two-fold purposes of EEOC charge filing in mind, courts have recognized several exceptions to the rule that parties not named in the EEOC charge are not subject to suit in a private civil action. As to one exception of import here, this court has determined that where an unnamed party has been provided with adequate notice of the charge, under circumstances where the party has been given the opportunity to participate in conciliation proceedings aimed at voluntary compliance, the charge is sufficient to confer jurisdiction over that party. *Davis v. Weidner*, 596 F.2d 726, 729 (7th Cir. 1979); *Williams v. General Foods Corp., supra*, 492 F.2d at 404–05. *Accord, Romero v. Union Pacific Railroad Co.*, 615 F.2d 1303, 1311–12 (10th Cir. 1980); *Kaplan v. International Alliance of Theatrical and Stage Employees and Motion Picture Machine Operators*, 525 F.2d 1354, 1358–59 (9th Cir. 1975).

■ The purpose behind this exception is to prevent frustration of the goals of Title VII by not requiring procedural exactness in stating the charges. *Davis v. Weidner, supra*, 596 F.2d at 729, *citing, Love v. Pullman Co.*, 404 U.S. 522, 526–27, 92 S.Ct.

---

**27.** Rose's first EEOC charge read:
> I have been denied entrance into the plumbers' union because of my race, Black. I was told on 8/12/75 that they were not taking any new apprentices. For the last 14 years they have denied me entrance.

**28.** Rose's second charge read:
> I have been denied an opportunity to obtain a status of journeyman plumber and entrance into the Plumbers Union because of my race. The last time I applied was on August 21, 1975. I had also applied on numerous occa-

sions during the past 14 years. During the same period, I have also applied for entrance into the Apprenticeship Program. I was repeatedly given the run-around until August 21, 1975 when I was advised that they were not taking any new Apprentices.

**29.** Since we determine that Rose's original charge was sufficient to reinstate the JAC within the trial court's jurisdiction, we need not address the propriety of the court's rulings as to the timeliness of the later charge or as to its agency rulings.

616, 618–619, 30 L.Ed.2d 679 (1972). Complainants often file EEOC charges without the assistance of counsel and are not versed either in the technicalities of pleading or the jurisdictional requirements of the Act itself. *Stevenson v. International Paper Co.*, 432 F.Supp. 390, 395 (W.D.La.1977). They are also not expected to file EEOC charges which specifically articulate in precise terms, a narrow legal wrong which they have suffered, rather EEOC charges are typically detailed in lay person's terms. *Tillman v. City of Boaz*, 548 F.2d 592, 594 (5th Cir. 1977) (per curiam) (and the cases cited therein). It is noted, in addition, that Congress could not have intended that a person filing EEOC charges should accurately ascertain, at the risk of later facing dismissal, at the time the charges were made, every separate entity which may have violated Title VII. *Glus v. G. C. Murphy Co.*, 562 F.2d 880, 888 (3d Cir. 1977) (*"Glus I"*). Thus, given the Act's remedial purposes, charges are to be construed with "utmost liberality" and parties sufficiently named or alluded to in the factual statement are to be joined.[30] *Jenkins v. Blue Cross Mutual Hospital Insurance Inc.*, 538 F.2d 164, 166–68 (7th Cir.), *cert. denied*, 429 U.S. 986, 97 S.Ct. 506, 50 L.Ed.2d 598 (1976); *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 462–63, 465 (5th Cir. 1970); *Martin v. Easton Publishing Co.*, 478 F.Supp. 796, 798 (E.D.Pa.1979) (and the cases cited therein).

■ Hence, we must first consider whether Rose's initial charge adequately served to notify the JAC of the alleged violation. Our reference to the record convinces us that the JAC *was* sufficiently apprised of the charge to meet this notice requirement. We begin by noting that five members of the ten person JAC board have been appointed by Local 130. These five individuals, as of the date of Rose's 1975 charge, were *all* serving as officers within Local 130, while simultaneously serving on the JAC. Their positions within Local 130 include respectively: the business manager, the business representative, an executive board member, the vice-president, and the recording secretary. Moreover, the JAC coordinator has served as an elected officer in Local 130 since 1966, and has signed affidavits and other pleadings in this litigation in the JAC's behalf.

The charge itself, which named Local 130, clearly complained of discriminatory exclusion from the apprenticeship program. Given that the JAC administers the only apprentice program of record, the charge was sufficient to apprise both the EEOC and the JAC of the alleged discriminatory practices. *Compare Kaplan v. International Alliance of Theatrical and Stage Employees and Motion Picture Machine Operators, supra*, 525 F.2d at 1359.

Accordingly, in light of the substantial similarity in the interests of the JAC and Local 130—the named party, and given both the JAC representation and implication within the charge itself, we hold that the JAC knew or should have known of the EEOC charge and that their conduct would be subject to EEOC inquiry. *Compare Goodman v. Board of Trustees of Community College District 524*, 498 F.Supp. 1329, 1333–34 (N.D.Ill.1980). Thus, the first prong of this exception, which would permit jurisdiction over the JAC, has been satisfied.

We must also ascertain whether the JAC has been given an opportunity to participate in conciliation proceedings aimed at voluntary compliance with Title VII. While satisfaction of this prong presents some difficulty, we conclude that it also has been met. *See Williams v. General Foods Corp., supra*, 492 F.2d at 405.

Resolution of this subissue requires consideration of the policies behind and purposes of conciliation. Conciliation between the parties may solve discriminatory problems without the animosities created by coercion, and it provides the respondent with the chance to voluntarily explain and

---

**30.** We are mindful that while liberality in construction is favored, some minimum standards of statutory compliance are essential in light of the strong emphasis upon voluntary compliance and conciliation. *See Scott v. University of Delaware*, 385 F.Supp. 937, 941 (D.Del.1974).

justify past conduct prior to the expense, publicity, and time consumption associated with litigation. *See Martin v. Easton Publishing Co., supra,* 478 F.Supp. at 797; *Scott v. University of Delaware, supra,* 385 F.Supp. at 941. However, we are mindful that while conciliation is encouraged, it is not an inalienable right of a defendant. *Gamble v. Birmingham Southern Railroad Co.,* 514 F.2d 678, 688 (5th Cir. 1975). These related policies and purposes must be balanced against the "availability of complete redress of legitimate grievances without undue encumbrance by procedural requirements especially when demanding full and technical compliance would have no relation to the purposes for requiring those procedures in the first instance." *Glus I, supra,* 562 F.2d at 888.

Upon balancing these considerations, we find that the JAC has been presented with a sufficient opportunity to conciliate.[31] As soon as the JAC had notice of the charge, either through its Local 130 members or through the JAC coordinator, nothing prevented it from attempting to resolve the alleged discrimination in an amicable manner. Any opportunity to effect voluntary compliance of Local 130 by the EEOC would have necessarily involved contact with the JAC, its coordinator, and its other members. *Compare Kelly v. Richland School District 2,* 463 F.Supp. 216, 218–21 (D.S.C.1978); *Wong v. Calvin,* 87 F.R.D. 145, 149 (N.D.Fla.1980). Thus, the JAC was presented with an adequate opportunity in this regard. Moreover, if a party has a close relationship with a named respondent, as does the JAC, and has actual notice of the EEOC charge, as it is likely the JAC has

had, to the extent that the JAC could have participated in conciliation efforts, the JAC "should not be heard to cry 'foul' when later made a defendant in a suit. . . ." *Stevenson v. International Paper Co., supra,* 432 F.Supp. at 397–98.

We question, in addition, the futility of presenting the JAC with more of an opportunity to conciliate than was presented herein. The Local 130 itself was unwilling to reach settlement with Rose or any other plaintiff and has fought their lawsuit with unmatched ferocity. It would seem reasonable from Rose's standpoint that if voluntary compliance was not obtainable through the EEOC from Local 130, the addition of the JAC to the conciliation effort would have made little if any difference. This conclusion is supported by the fact that the JAC did not settle the claims against it after Rose filed his later EEOC charge, specifically naming the JAC.

Since the JAC was properly noticed and provided with the requisite opportunity for conciliation, its dismissal as a Title VII defendant by the district court was error.[32] Thus, the JAC must be reinstated as a defendant to plaintiffs' Title VII claim.

■ Our reference to the oft-cited factors employed by the Third Circuit and other courts in making this determination compels the same conclusion.[33] In *Glus I, supra,* 562 F.2d at 888, the court combined the factors underlying the established exceptions into a four pronged test for use in determining whether to excuse a failure by an individual plaintiff to name a defendant in the EEOC charge:

31. Thus, we must reject the JAC's argument that it was presented with no opportunity to conciliate.

32. The JAC is probably an indispensable party for Title VII purposes under Fed.R.Civ.P. 19, as it administers the Local 130–PCA apprenticeship program and controls, in part, access to the plumbing trade. *See Evans v. Sheraton Park Hotel,* 164 U.S.App.D.C. 86, 503 F.2d 177, 183 (1974); *E.E.O.C. v. International Brotherhood of Electrical Workers,* 476 F.Supp. 341, 349–50 (D.Mass.1979); *Eldredge v. Carpenters 46 Northern California Counties Joint Apprenticeship and Training Committee,* 440 F.Supp.

506, 524–26 (N.D.Cal.1977) (and the cases cited therein). Given our holding herein, however, we need not reach this issue.

33. While it is normally within the province of the district court to initially consider such factors and to make the jurisdictional determinations, where that court has implicitly considered the factors and so ruled, and where the record is sufficiently established, as it is here, we may evaluate the factors without remand. *See Romero v. Union Pacific Railroad Co., supra,* 615 F.2d at 1312.

(1) Whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint.

(2) Whether, under the circumstances, the interests of a named party are so similar to the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings.

(3) Whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party.

(4) Whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.

In *Glus v. C. G. Murphy Co.*, 629 F.2d 248, 251 (3d Cir. 1980), *vacated on other grounds*, —— U.S. ——, 101 S.Ct. 2013, 68 L.Ed.2d 321 (1981) (*"Glus II"*), the Third Circuit noted that the four pronged test is not a mechanical one, and accordingly no single prong is to be decisive. Instead, each prong must be carefully evaluated in light of both Title VII's remedial purposes as well as the interests of the parties.

As to the first prong, nothing indicates that Rose had any way of knowing the extent of the JAC's involvement in the allegedly discriminatory action or their motivation. *Compare Green v. United States Steel Corp.*, 481 F.Supp. 295, 304 (E.D.Pa. 1979); *Martin v. Easton Publishing Co., supra*, 478 F.Supp. at 798. Given the close relationship between Local 130 and the JAC, it would be unreasonable, contrary to the JAC's view, to expect that Rose would be cognizant that the JAC possessed a legal identity separate and distinct from Local 130—the named party. The second prong also supports plaintiffs' position. In addition to the above-detailed considerations concerning the opportunity for conciliation by the JAC, the interests of the JAC, while not identical to those of Local 130, are similar enough that if Local 130 complied or conciliated, surely the JAC would perforce comply. The conciliation process was not rendered less effective because of the JAC's absence. As to the third prong, no prejudice, contrary to the JAC's assertions, is present in the record and no likelihood of compliance, explanation, or justification is evident. It is highly unlikely, that if the JAC had been given an opportunity to conciliate, that any of the alleged past practices would have been rectified. We again note that the JAC effected no conciliation under Rose's later charge, which specifically named the JAC. The fourth prong, if anything, supports plaintiffs. The JAC's full name—the "Joint Apprenticeship Committee Local 130, U.A." indicates that Local 130 *could* have been the party with whom Rose should have contacted or identified. The close relationship between Local 130 and the JAC both in terms of board members, its coordinator, and the officers could have led Rose to reasonably assume that the interests of both were represented by Local 130.[34] *Compare Glus II, supra*, 629 F.2d at 252.

Circuit Rule 18 shall apply.[35] Parties shall bear their own costs.[36]

REVERSED AND REMANDED.

---

**34.** While the record is unclear, it appears that the apprentice cards issued by the JAC state that the apprentice holders are affiliates of "Chicago Journeymen Plumbers, Local 130."

**35.** On February 4, 1980, the defendants-appellees moved this court to dismiss appeal No. 80–1008 for want of appellate jurisdiction. The motion was denied on March 3, 1980 (Bauer, J.). On March 7, 1980, defendants-appellees' motion for reconsideration of the order denying the motion to dismiss was denied, without prejudice to the defendants-appellees again raising the jurisdictional arguments in the merits briefing of these appeals (Bauer, J.). Finding an absence of discussion of these arguments in the defendants-appellees' briefs, the request for reconsideration of the motion to dismiss is deemed to have been waived. In any event, the denial of the motion to dismiss for want of jurisdiction was proper.

Objection is also made by plaintiffs that sanctions were imposed without a specific order being violated as might be obtained under Rule 37. In view of our disposition of this case that issue need not now be explored.

**36.** Nothing in this opinion is intended to imply any view whatsoever as to the possible merit of plaintiffs' claims, but what has happened so far in this case is not the way to find out whether there may be merit or not.